HOMER G. STAPLETON, APPELLEE, v. CHICAGO, BURLINGTON
& QUINCY RAILROAD COMPANY, APPELLANT.

FILED MAY 5, 1917.   No. 19280.

1. **Witnesses:** PRIVILEGED COMMUNICATIONS: PHYSCIANS.  When a
party submits to an examination, or inspection, by a physician,
for the purpose of learning the state of his health or the physical
condition of any part of his anatomy, the knowledge thus ac-
quired by the physician is privileged, and, under section 7898,
Rev. St. 1913, the physician is not permitted to testify to the
condition he found, over objection based upon the statute.

2. ———: ———: ———.  When plaintiff has permitted a physician
to make a radiograph of his injured foot for the purpose of as-
certaining the extent and character of his injuries, the radio-
graph so made is not admissible in evidence over objection of
plaintiff based upon the statute.

3. **Master and Servant:** INJURY TO SERVANT:  INTERSTATE COMMERCE.
The evidence, set out in the opinion, *held* insufficient to show that
the locomotives being moved when plaintiff received his injuries
were instruments of interstate commerce.

4. **Damages:** REMITTITUR..  The evidence of plaintiff's life expectancy
and earning capacity and the extent of his injuries, set out in the
opinion, and a verdict of $17,500 *held* so excessive as to require a
remittitur of $5,500.

APPEAL from the district court for Douglas county:
ALEXANDER C. TROUP, JUDGE. *Affirmed on condition.*

*Byron Clark, Jesse L. Root* and *J. W. Weingarten,* for
appellant.

*Benjamin S. Baker* and *E. A. Conaway, contra.*

MORRISSEY, C. J.

Plaintiff recovered judgment for personal injuries re-
ceived while in the employ of defendant.  Defendant has
made an unusual number of assignments of error, but they
all fall within three or four general groups.  The injury
was received May 9, 1914, while plaintiff was engaged in
switching 2 dead engines and 2 shop cars in the yards at
Havelock, Nebraska, and is alleged to have been received

in the following manner: The switch engine was moving in an easterly direction, and plaintiff was riding on an iron step on the south side of one of the dead engines, the step being attached to the pilot beam of the engine, and being about a foot in length and eight inches in width. He was standing on this step and holding on to the handrail with both hands, when the step struck a cross-tie which had been left in too close proximity to the track. This tie, together with a great many others, had been thrown off along the right of way by a different crew and was intended for use in repairing the track. It is claimed that the impact of the step against the tie knocked plaintiff's feet from the step; that his right ankle was struck and injured in such a manner as to destroy the normal use of his foot and leg, and that he is permanently disabled.

Defendant admitted the allegation as to employment, and that while in such employment plaintiff's ankle came in contact with the tie or some other substance, denied all other allegations of the petition, and alleged that plaintiff was an experienced switchman, knew the condition of the track and premises, and that whatever injury he received arose out of the hazard which he assumed by virtue of his employment, and that his injuries were caused by his own negligence and carelessness. During the trial a shoe which plaintiff wore on his right foot at the time of the injury was offered in evidence. This shoe showed an abrasion of the leather, and on cross-examination defendant's counsel asked the witness several questions in regard to the shoe, and as to the time when he concluded to preserve it as evidence. On redirect examination plaintiff testified that he concluded to preserve the shoe about the time defendant offered to pay him $750 in settlement. Timely objection to this testimony was made, but overruled. Subsequently the court struck out this testimony, and instructed the jury that the testimony was withdrawn from the record, and that they should not consider it or give it any consideration. Defendant says the action of the court in withdrawing the testimony and giving this instruction to the

jury did not correct the error in admitting the testimony, and also that by striking it out he denied defendant the opportunity to cross-examine in relation thereto. The testimony was improperly admitted, but, in view of the admissions in defendant's answer that plaintiff received injuries while in its employment, we cannot see that a mere offer of settlement would seriously prejudice defendant before the jury, even though the evidence had not been stricken out. The court having withdrawn the evidence and instructed the jury to disregard it, the error is not so prejudicial as to require a reversal.

Dr. Wilson, a witness for plaintiff, testified that in examining plaintiff's limb he found an area of anesthesia; "he has no feeling on the inner side extending up to within about four inches below the knee; and he has no feeling in the back part of his leg extending up to about the half of the calf of the leg; that the reflexes, the knee jerk, is absolutely minus in that leg; * * * it indicated the absence of the proper condition of the nerve of the right leg. It also showed that the Babinski reflex was minus. * * * By scratching the bottom of the foot the great toe is in dorsal flexion. This is minus also. * * * I made a test of his pupillary reaction, of his eyes, and of the Romberg's sign, showing a condition that we always try to find out in case there is any nerve trouble, and in measuring the foot I find the measurements of the leg on that side are three-quarters of an inch smaller than on the other. Q. At what point? A. At the calf is three-quarters and at the ankle is three-eights. Q. What does that indicate, Doctor? A. It indicates an atrophy of the muscle or a malnutrition."

Presumably to contradict this testimony, defendant called as witnesses several doctors, all but one or two of whom were in its regular employ, to whom plaintiff had submitted his leg for inspection and examination. This testimony was objected to on the ground that it falls within the prohibition contained in section 7898, Rev. St. 1913, providing: "No practicing * * * physician * * *

or surgeon * * * shall be allowed in giving testimony
to disclose any confidential communication, properly en-
trusted to him in his professional capacity, and necessary
and proper to enable him to discharge the functions of his
office." The objections were sustained, and the greater
part of defendant's brief is given up to an effort to show
that this evidence was admissible. In this connection sev-
eral propositions are laid down: First, it is said that
when a party asks to exclude evidence under this section
of the statute he must make it appear that the physician
acquired his knowledge while attending the patient in his
professional capacity. This meaning may be fairly in-
ferred from the section itself. Immediately after the in-
jury plaintiff consulted defendant's local physician, Dr.
Ballard. Later he called on other physicians of the com-
pany, Drs. Hollenbeck and Wenger, and he had testified
as to measurements they had made of the leg, and the
court permitted these physicians to testify as to the meas-
urements because testimony on that subject had been of-
fered by plaintiff, but their testimony on all other branch-
es of the case was excluded, although defendant offered to
prove by these physicians that their examination was not
for the purpose of treatment. Two of the physicians made
X-ray examinations, but none of the physicians whose tes-
timony was excluded prescribed for the plaintiff. Dr.
Buchanan testified that plaintiff called at his office in the
summer of 1914, and he made a radiograph of plaintiff's
foot and ankle. Defendant offered these plates in evi-
dence, but they were excluded. Dr. Hollenbeck testified
that plaintiff called at his office August 27, 1914, and once
or twice afterwards; that he was not there for treatment,
but was there for the purpose of having an examination
made to ascertain the condition of his foot. Dr. Wenger
testified that plaintiff called at his office in September,
1914; that he was not there for the purpose of treatment.
"He was there for examination, * * * for a physical
examination." Dr. Young met plaintiff in Dr. Hull's of-
fice in August, and made an examination of him "to ascer-

tain the state of his health at that time, his physical condition, * * * with particular reference to his right ankle and limb." Dr. Hull testified as to the examination at which Dr. Young was present, and said the purpose was to determine his physical condition. Dr. Tyler, another X-ray specialist, said plaintiff called on him "for an X-ray examination of the foot, * * * to find out the condition of the bones in the foot." He further testified that he was sent to him by Dr. Hull, and later stated that he was employed by the defendant. We cannot escape the conclusion that as to each of these witnesses the relation of physician and patient existed. It was because of their professional training that plaintiff submitted his leg for inspection and examination. The statute cannot be given a strained construction, but must be taken in its plain and ordinary sense. When it says that a physician shall not be allowed to give testimony or to disclose confidential communications properly entrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office, it means to exclude the disclosure of any information that comes to such physician by reason of the professional capacity in which he acts. It does not matter whether the patient seeks a prescription for a disordered stomach or a radiograph of an injured foot. Nor does the statute make any distinction between a regularly retained physician of a railroad company, who is paid for his services by the railroad company, and a physician paid by the patient.

In *Battis v. Chicago, R. I. & P. R. Co.,* 124 Ia., 623, the court had under consideration a question somewhat analagous to that which we are discussing. The statute of Iowa is very similar to ours. The station agent called the local surgeon for the railroad company to attend plaintiff who had received an injury. It was claimed by the railroad company that the physician was its employee, was acting for it, and that the physician was in no sense the physician of plaintiff. The court said: "The allegiance of the physician must be wholly upon one side or the other.

It matters not, in this connection, who calls him in the first instance, or who pays him."

The same rule which would exclude the oral testimony of the doctor would exclude the radiographs of plaintiff's foot. Its introduction in evidence would be a disclosure of a confidential communication.

In *Sovereign Camp, W. O. W., v. Grandon,* 64 Neb. 39, in discussing the statute at page 46, this court said: "The rule in this state, as well as in other states having a like statute, is that the above sections protect a party against any disclosure by a physician made to him in the course of his professional employment, and necessary and proper to enable him to discharge his duty to his patient. Not only are such communications privileged, but whatever knowledge the physician may gain from observing his condition and symptoms is likewise privileged. There can be no doubt as to the rights of the patient in this respect, and the courts, in a proper case, are vigilant to see that these rights are fully protected."

"Information acquired by the physician by looking at the patient or by examination is as much within the statutes as are the verbal communications which take place between them." *Smart v. Kansas City,* 208 Mo. 162, 197.

Defendant complains because on cross-examination it was not permitted to inquire whether plaintiff had submitted himself for examination to specialists for the purpose of qualifying them as witnesses, and that he did not intend to produce these witnesses upon the trial. This line of examination was not pertinent to anything developed in the examination of the witness in chief. He had the right to select his own physicians and his own witnesses. If counsel for defendant disbelieved the testimony of Dr. Wilson, who testified as to the character and extent of plaintiff's injuries, he might have procured the testimony of men eminent as physicians and surgeons by application to the court for the appointment of a commission to make an examination of the person of the plaintiff. *State v. Troup,* 98 Neb. 333.

One paragraph of instruction No. 3, defining negligence, is singled out and criticized. It is a familiar rule that the instructions must be construed together. This rule must be applied to instruction No. 3, and when so applied the instruction correctly states the law.

Defendant further complains because the court refused to submit the defense of assumption of risk, which it contends is applicable to this case under the federal employers' liability act. Was there sufficient proof to warrant the court in submitting this defense? Plaintiff alleges in his petition that defendant operates a line of railroad "in and through the states of Iowa, Nebraska, Kansas, Colorado, and Wyoming, over which is carried passengers and freight for hire as a common carrier to and over points on its said railroad." This allegation is admitted in the answer of defendant, but the answer makes no reference whatever to interstate traffic. The accident occurred in defendant's yards at Havelock, Nebraska. The only testimony cited by defendant to sustain its contention that the engines being moved were engaged in interstate commerce was elicited on the cross-examination of the plaintiff: "Q. Were the cars next to the switch engine? A. They were. Q. And then came the two dead engines? A. Yes, sir. Q. They were both of the same class, were they not? A. Yes, sir. Q. What were they, 0-2? A. 0-2, or 0-1, I don't remember now. Q. That is the largest class of freight engines used on the Burlington? A. I think so, at that time. Q. Since then they have put out the M-1? A. I think so. Q. But before your accident they were the largest class of locomotives in use by the Burlington on the lines west of the river? A. No. Q. Unless it would be the Mallet? A. The Mallets were larger; yes, sir. * * * Q. And they are used exclusively for hauling through freight trains? A. Yes, sir. Q. Had these dead engines, before the accident, been in use by the Burlington? A. Yes, sir. Q. On the lines west? A. The lines east. Q. And had been brought to Havelock for repair? A. Yes, sir. Q. After they were overhauled and

repaired, then do they go back in the same service? A. I think so."

This testimony shows that the engines had been used for hauling through freight trains, but we are not informed as to what is meant by the term "through freight train." There is no suggestion that these engines crossed a state line or that they hauled freight that crossed a state line. If we are left to speculate as to the character of a through freight train, we might suppose that it is a train running from one division point to another division point without stopping to pick up or to unload local freight. There are a number of division points on defendant's lines within the state of Nebraska. To say they are in use on "the lines east of the river" or "the lines west of the river" is equally indefinite. The Burlington railroad crosses the Platte river at Ashland, a few miles east of Havelock, and this statement might as well apply to engines in use east of the Platte river or west of the Platte river as to apply to some river flowing between two states. If these engines had, in fact, been used in interstate commerce, defendant might easily have so shown, and it was its duty to do so. There being a failure of such proof, the court properly withdrew the defense of assumption of risk from the jury. But he not only withdrew that defense, but told the jury that, "by an express provision of the statutes of the state of Nebraska, the plaintiff in such case cannot be held to have assumed any of the risks of his employment; and, therefore, should you find from the evidence, as heretofore stated, that the defendant or its servants was guilty of negligence as charged, and that the same was the proximate cause of plaintiff's injury, then you should find that plaintiff did not assume the risk of his employment arising from such negligence."

It is said in defendant's brief that this instruction not only deprived defendant of that defense, but that "its plain purport is that defendant had interposed a defense declared unlawful by the legislature of Nebraska," and that the effect of this is to prejudice defendant's cause in

Stapleton v. Chicago, B. & Q. R. Co.

the minds of the jury. Perhaps a discussion was unnecessary, but we cannot see that it would have any prejudicial effect, and, if error it is, it is error without prejudice. *Carlon v. City Savings Bank,* 85 Neb. 659.

It is not possible within the limits of this opinion to discuss separately all of the assignments made, but those not discussed have been considered. The verdict and judgment was for $17,500. Neither counsel has seen fit to favor us with any suggestion as to what would be a fair recovery under the circumstances, although counsel for defendant refers to this verdict as "monstrous and out of proportion to any possible injury inflicted." At the time of the injury plaintiff was 37 years of age. He had a life expectancy of 29 years, and was earning from $100 to $125 a month as a switchman. He is not educated in any of the professions, but has throughout his life been engaged in hard manual labor. The nature of plaintiff's injury is such as will necessarily prevent him from continuing in his usual occupation and will greatly lessen his capacity for earning money. What he may earn in his crippled condition is hard to estimate, still it is clear that he is not wholly incapacitated. There is but meager proof of pain and suffering, compensation for which is always difficult to measure. Though his foot is crippled, plaintiff is not entirely deprived of its use. Serious as his injuries are, they are not such as to sustain the verdict for the full amount, and we are constrained to hold that the verdict is excessive, and that plaintiff should be required to remit all in excess of $12,000. If plaintiff files such remittitur within 20 days, the judgment as thus reduced is affirmed; otherwise it will stand reversed, and the cause remanded for further proceedings.

AFFIRMED ON CONDITION.

SEDGWICK, J., not sitting.