STATE OF NEBRASKA, APPELLEE, V. BARBARA SWAYZE,
APPELLANT.
247 N. W. 2d 440

Filed December 8, 1976. No. 40518.

P. J. Heaton, Jr., for appellant.

Paul L. Douglas, Attorney General, and Jerold V. Fennell, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

WHITE, C. J.

This is an appeal from a conviction for assault with intent to murder. The alleged assault occurred on a newly born male child found on June 11, 1974, abandoned in a women's toilet at the Lodgepole State Way-

side Park in Kimball County, Nebraska. The defendant was found guilty by a jury, and sentenced by the District Court to the State of Nebraska Department of Corrections for not less than 3 years and 6 months, nor more than 7 years. We affirm the judgment and sentence of the District Court.

The defendant, on appeal, raises two primary contentions. First, that certain evidence was taken from her in violation of her constitutional rights and later erroneously admitted into evidence; and, second, that the evidence does not support the verdict.

On November 5, 1974, Nebraska State Patrol criminal investigator, James G. Robinson, filed an affidavit of peace officer in the District Court for Kimball County, Nebraska, pursuant to the Nebraska Identifying Physical Characteristics Act, sections 29-3301 to 29-3307, R. R. S. 1943, requesting an order requiring four parties, including the defendant, to submit to blood tests. That same day the District Judge ordered the four persons, including the defendant, to submit to blood tests. On December 17, 1974, the defendant was formally charged with assault with intent to murder in violation of section 28-409, R. R. S. 1943. The results of the blood tests administered to the defendant were admitted into evidence at the trial.

The defendant contends that the Identifying Physical Characteristics Act is unconstitutional and that her constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States, and their equivalents in the Constitution of the State of Nebraska, were violated by having been compelled under the Act to submit to a blood test. We hold that the Identifying Physical Characteristics Act is constitutional and that there was no violation of the defendant's constitutional rights when she was required under the Act to submit to a blood test. Consequently, there was no error in admitting the result of this test at the trial.

The Identifying Physical Characteristics Act lays out a procedure whereby law enforcement officers can obtain physical evidence from individuals to aid them in identifying the perpetrators of criminal offenses. Section 29-3301, R. R. S. 1943, defines identifying physical characteristics as including: "* * * fingerprints, palm prints, footprints, measurements, handwriting exemplars, lineups, hand printing, voice samples, blood samples, urine samples, saliva samples, hair samples, comparative personal appearance, and photographs of an individual."

Section 29-3302, R. R. S. 1943, authorizes judges and magistrates to issue orders for obtaining these items. Section 29-3303, R. R. S. 1943, provides in part that: "The order may issue upon a showing by affidavit of a peace officer that (1) there is probable cause to believe that an offense has been committed; (2) that procurement of evidence of identifying physical characteristics through nontestimonial identification procedures from an identified or particularly described individual may contribute to the identification of the individual who committed such offense; and (3) that the identified or described individual has refused, or there is reason to believe he will refuse, to voluntarily provide the desired evidence of identifying physical characteristics."

Section 29-3304, R. R. S. 1943, spells out situations where it is not necessary to obtain an order to secure identifying physical characteristics. Section 29-3305, R. R. S. 1943, describes what the order shall contain, and provides that the person to whom the order is directed shall be guilty of contempt in the event he fails to comply with the order. Section 29-3307, R. R. S. 1943, limits the punishment for contempt to 30 days imprisonment in the county jail.

In Schmerber v. California, 384 U. S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), the Supreme Court affirmed the defendant's conviction for driving while in-

toxicated. After the defendant's arrest, while he was at the hospital receiving treatment for injuries suffered in an automobile accident, a blood sample was withdrawn from the defendant over his objections. The report of the chemical analysis of the blood sample, showing intoxication, was admitted into evidence at the defendant's trial. On appeal, one of the defendant's contentions was that the compulsory blood test violated his constitutional privilege against self-incrimination. Rejecting that contention, the court held: "We hold that the privilege [against self-incrimination] protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and that the withdrawal of blood and the use of the analysis in question in this case did not involve compulsion of these ends." The court went on to say: "Not even a shadow of testimonial compulsion upon or enforced communication by the accused was involved either in the extraction or in the chemical analysis. Petitioner's testimonial capacities were in no way implicated; indeed, his participation, except as a donor, was irrelevant to the results of the test, which depend upon chemical analysis and on that alone. Since the blood test evidence, although an incriminatory product of compulsion, was neither petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner, it was not inadmissible on privilege grounds."

Nebraska follows the distinction explicitly recognized in Schmerber v. California, *supra*. In State v. Oleson, 180 Neb. 546, 143 N. W. 2d 917 (1966), we held: "The privilege against self-incrimination is limited to the giving of oral testimony and does not extend to defendant's body, nor to secretions therefrom, nor to the introduction of the chemical analysis in evidence." See, also, United States v. Wade, 388 U. S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); Holt v. United States, 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021. The Identifying Physi-

cal Characteristics Act clearly follows this distinction and applies only to physical evidence, and not to oral communications or testimony. See §§ 29-3301, 29-3303(2), 29-3305(6), R. R. S. 1943.

The minute sample of blood which the defendant was required to supply for testing was physical evidence, not testimony or communications. Requiring the defendant to submit to the blood test, under threat of contempt, involved no violation of her privilege against self-incrimination.

The defendant's Fourth Amendment rights against unreasonable search and seizure were not violated. "* * * the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions * * *." Schmerber v. California, supra. The procedure followed in obtaining a sample of the defendant's blood for testing was analogous to obtaining a search warrant. The peace officer must file an affidavit with a judge or magistrate. Upon a showing of probable cause, the judge or magistrate has the power to issue the order. The order must be specific as to what is desired, and remains in force no more than 15 days after issuance. The entire Identifying Physical Characteristics Act is rife with safeguards designed to protect the individual from whom physical evidence is sought. What the court said in Schmerber, regarding the defendant's search and seizure claim there, is relevant here: "Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned. The requirement that a warrant be obtained is a requirement that the inferences to support the search 'be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' * * * The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search

of evidence of guilt is indisputable and great." We find no constitutional infirmities in the application of the Act to the defendant.

The defendant next contends that the evidence does not support the verdict. The evidence in this case was circumstantial and largely conflicting. In determining whether the evidence was sufficient to support the verdict, we keep in mind the following rules: "In determining the sufficiency of evidence to sustain a conviction in a criminal prosecution, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the jury." State v. Spidell, 194 Neb. 494, 233 N. W. 2d 900 (1975). "The test of the sufficiency of circumstantial evidence in a criminal prosecution is whether the facts and circumstances tending to connect the accused with the crime charged are of such conclusive nature as to exclude to a moral certainty every rational hypothesis except that of guilt." State v. Bartlett, 194 Neb. 502, 233 N. W. 2d 904.

The evidence adduced at the trial, which could be said to support the State's case, was as follows: Albert Manderville of Grand Island, Nebraska, testified that in the course of his employment he was required to visit Kimball, that he became acquainted with the defendant, and that they had sexual relations. He testified that they had sexual relations during the months of August, September, and October of 1973.

Nathan Walls, a police officer with the Kimball police department, testified that the baby boy was found at approximately 6:45 p.m. on June 11, 1974. Dr. John P. Byrd, a general practitioner in Kimball, examined the baby on June 11, 1974, shortly after he was discovered and rescued, around 7:45 p.m. He testified that in his opinion the baby was 6 to 12 hours old at that time.

Mrs. Oma Smith, a neighbor of the defendant, testi-

fied that in her opinion the defendant was pregnant during the first 6 months of 1974. She also testified that when the defendant returned from a vacation (around July 1, 1974) she appeared to have lost a lot of weight. Dorothy Shelburne, a coworker of the defendant's, testified that on June 11, 1974, the defendant called in to work and stated that she would not be in. She also testified that in her opinion the defendant was pregnant. Barbara Ann Thacker, coowner of the Hickory Inn where the defendant worked, also testified that she thought the defendant was pregnant in the spring of 1974. She also observed that the defendant had lost a lot of weight when she returned from her vacation. Carol Crow, another coworker of the defendant, also testified that the defendant was pregnant, as did Linda Hatch, a beautician, who testified that she had known the defendant for many years. Mrs. Hatch further testified that on June 11, 1974, while the defendant was at her beauty shop at approximately 3 p.m., the defendant discharged a large amount of blood on one of the chairs at the beauty salon. Dorothy Shelburne testified that on June 12, 1974, the defendant looked "gastly white," and appeared not to feel well that day. Carol Crow testified that the defendant "looked awful" on June 12, 1974.

Albert Manderville testified that on July 18, 1974, while he was with the defendant at his motel room, she told him that she had had a baby in Scottsbluff and had given it away, and indicated to him that he was the father of this baby.

The defendant was also employed by Mrs. Bernice Linn in Kimball as a house-cleaner. Mrs. Linn's daughter-in-law, Mrs. Donna Linn, testified that this home contained an apartment which was unoccupied on June 11, 1974. She testified that on June 16, 1974, she discovered a large stain on the bedroom rug in the apartment and on July 28, 1974, she discovered stains on the mattress and bed in the same room.

Special Agent William Gavin of the FBI testified that he conducted laboratory tests on various of the State's exhibits: The mattress padding, mattress cover, piece of rug, and blood scrapings found on a bedrail, all from the bedroom in the apartment in the Linn home. He testified that type A human blood was present on these items. Dr. Alvin Armstrong from Scottsbluff testified that he examined the sample of the defendant's blood brought to him by Officer Robinson and that it was type A blood.

Sheriff James J. Taylor of Kimball County, Nebraska, testified that on June 13, 1974, he contacted the defendant and requested that she have a physical examination. When he later contacted her about this physical, she showed him exhibit 5, which purports to be a letter from Dr. Robert H. Bowden of Casper, Wyoming, stating that there has been a medical examination and that there is "no evidence of pregnancy in the past three weeks." Officer Robinson testified that he questioned the defendant on July 24, 1974, and that during this meeting she also produced exhibit 5. He testified further that he then advised her that he was aware that she had not taken the physical described in exhibit 5, whereupon the defendant produced exhibit 11, a letter from Dr. Bowden describing a physical given to a 23-year-old female weighing 98 pounds. The defendant admitted to Officer Robinson that she had typed exhibit 5 herself, and admitted at the trial that she had also forged Dr. Bowden's signature to it.

Exhibit 4 was the hospital record of the abandoned child found on June 11, 1974. It indicates that he weighed 8 pounds, 4 ounces. The defendant testified that the 5 children she had given birth to ranged from 6 to 9 pounds.

The above-outlined evidence, if believed by the jury, was sufficient to support a finding of guilty.

The judgment and sentence of the District Court are correct and are affirmed.

AFFIRMED.