DOLORES J. BRANCH, ADMINISTRATRIX OF THE ESTATE OF HUBERT L. BRANCH, DECEASED, APPELLANT, V. JOHN S. WILKINSON, APPELLEE.

256 N. W. 2d 307

Filed June 15, 1977. No. 40893.

Gregory J. Beal of Beal & Jensen, for appellant.

Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

WHITE, C. J.

This is a wrongful death action brought by the plaintiff, Dolores J. Branch, Administratrix of the Estate of Hubert L. Branch, deceased. The plaintiff's decedent was killed as a result of an automobile accident in Morrill County, Nebraska, on March 9, 1974. The plaintiff's decedent was a passenger in the motor vehicle. The defendant owned and operated the vehicle. In her petition, the plaintiff alleged negligence, including speeding and intoxication, and sought special and general damages, including damages for conscious pain and suffering by her decedent.

The defendant answered with a general denial and filed a motion to suppress evidence derived from blood samples taken from the defendant after the accident. The District Court sustained the defendant's motion to suppress evidence of the blood alco-

hol test of the defendant on the theory that the test was within the physician-patient privilege. The defendant then filed an amended answer denying that he was intoxicated at the time of the accident and alleging that the plaintiff's decedent assumed the risk, along with other specifications of negligence on the decedent's part, which, in essence, were failure to warn of approaching danger and failure to have seat belt in place and fastened.

The case was tried to a jury. At the close of the plaintiff's case, the defendant moved for a directed verdict. The District Court sustained this motion. The plaintiff filed a motion for a new trial, which was overruled, and now appeals. We affirm the judgment of the District Court.

The plaintiff's primary contention on appeal concerns the admissibility of the results of a blood alcohol test conducted on a blood sample taken from the defendant shortly after he had been brought to the hospital. The results of this test showed an alcohol content of 0.10 percent in the defendant's blood at the time the sample was withdrawn, approximately 2½ hours after the accident. The District Court held that the results of the blood alcohol test were inadmissible due to the physician-patient privilege. The plaintiff argues that the blood alcohol test results are not privileged and that, if they are, the privilege was waived by the defendant.

The record reveals the following facts relevant to the taking of a blood sample from the defendant. The accident took place at approximately 3:12 a.m. on March 9, 1974. At 4:11 a.m. Officer Harris of the State Patrol arrived at the accident scene. At 4:50 a.m. ambulances arrived at the accident scene. Officer Harris accompanied the ambulances to the Bridgeport hospital, where they arrived at approximately 5:30 a.m. Branch was taken to the emergency room and attended to by Dr. Blackstone. Wilkinson was taken to the x-ray room and attended

to by Dr. Post. Wilkinson was unconscious when brought to the hospital. At trial Dr. Post testified: "I made an order for the usual profile or battery of tests to evaluate the general blood condition." Techologist Hadden, on call at the time, stated in a deposition that she was directed by Dr. Post to draw a blood sample from both Wilkinson and Branch, and that after she drew the blood sample from Wilkinson, she placed it in the refrigerator. The blood sample of Wilkinson, which was tested for alcohol content was labeled, "John Wilkinson, Oshkosh, 5:35 a.m. 3-9-74, by B. Hadden." After Dr. Post had been with Wilkinson for 15 or 20 minutes, he was interrupted by Nurse Bateman concerning Branch. He proceeded to Branch, who died shortly thereafter at 6:07 a.m.

In her deposition, Mrs. Hadden stated that the blood alcohol sample from Wilkinson was given to the State Patrol. She stated: "This was the order from Dr. Post that if they requested it, it was to be given them. They did request it the following morning." She stated that she believed Officer Hansen of the State Patrol, who arrived at the hospital shortly after the ambulances arrived, requested the sample. She stated that she did not know whether Officer Hansen spoke previously to Dr. Post concerning the sample or not; that he asked her for the blood sample; and that she gave it to him.

Roger Lott, county attorney of Morrill County at the time, testified that he arrived at the hospital shortly after Branch had died. He stated that the possibility of drinking was discussed with Officers Harris and Hansen before the three left at 7:39 a.m. to inspect the accident scene. Lott testified that he ascertained that a blood alcohol sample had been taken from Wilkinson and that he had a conversation with one of the State Patrol officers concerning the taking of the blood alcohol sample from Wilkinson. He stated that he did not specifically request the

doctor to take the sample but knew that a sample had been taken. He testified that he had a discussion with Officers Harris and Hansen concerning the policy with respect to the blood alcohol sample and was told that it was the policy of the State Patrol to take a blood test on any state patrolman who was involved in either a personal injury or fatality accident. Lott stated that he had no personal knowledge that the blood sample had been obtained by the State Patrol, but later the State Patrol provided him with the results of the test. He stated that he was told that Officer Hansen took the test to Scottsbluff and that it was his understanding the test would be obtained from the hospital that morning and taken to Scottsbluff.

In Dr. Post's deposition, the following exchange took place:

"Q. In the course of the treatment of your patient, would you, yourself, have any reason or need or desire for a blood alcohol test of the patient?

"A. Yes. It is my custom in patients that suffer any kind of head injury, for whatever reason, I ask for a blood alcohol if there is any evidence whatsoever that it's needed. Also, we test for diabetes. * * *

"Q. Well, the question was whether or not you needed the blood alcohol test to treat the patient at that particular time?

"A. On entry and shortly thereafter?

"Q. Or thereafter.

"A. I believe the knowledge of blood alcohol would have a pertinent and important place in the treatment of this patient.

"Q. As it developed, though, whether or not Mr. Wilkinson did have some alcohol content in his blood was not a critical factor?

"A. This is true * * *."

In an affidavit filed by the defendant in support of his motion to suppress, Dr. Post stated that the blood alcohol test on Wilkinson was performed as a

normal diagnostic procedure for an unconscious patient; that no law enforcement official requested that a blood alcohol test be taken from Wilkinson; that sometime after the test was taken he had a discussion with Roger Lott, the county attorney, concerning whether such a test had been taken; that he informed Lott that such a test had been taken; that it was available to him or the State Patrol; and that Lott told him he wanted the test.

The following picture is thus presented: The blood sample was withdrawn from Wilkinson at 5:35 a.m., within minutes after the ambulances arrived at the hospital. Dr. Post testified that he ordered that the blood sample be taken from Wilkinson. Officer Hansen did not arrive at the hospital until 5:42 a.m., and the county attorney arrived after Branch had died. Thus, at the time the blood sample was taken, Officer Harris was the only law enforcement person present, having arrived with the ambulances. There is absolutely no evidence in the record that Officer Harris requested Dr. Post to withdraw the blood sample from Wilkinson. Dr. Post testified as to the medical reasons for obtaining a blood sample from Wilkinson. Later, Officers Harris and Hansen, and county attorney Lott discussed the possibility of drinking being involved in the accident. It was ascertained that a blood sample had been taken from Wilkinson and was available for a blood alcohol test. Dr. Post made the sample available to either Lott or the State Patrol, and later the State Patrol obtained the sample from Mrs. Hadden and conducted a blood alcohol test on it in Scottsbluff.

The question which we must initially decide on appeal is whether the District Court was correct in suppressing and refusing to admit into evidence the results of the blood alcohol test conducted on the blood sample taken from the defendant on the ground that said results were within the contemplation of the physician-patient privilege.

The present statute stating the physician-patient privilege is section 27-504, R. R. S. 1943, of the Nebraska Rules of Evidence. Prior to the adoption of section 27-504, R. R. S. 1943, the privilege was found in section 25-1206, R. R. S. 1943. At common law, there was no physician-patient privilege. Simonsen v. Swenson, 104 Neb. 224, 177 N. W. 831 (1920). We have held that the statute granting the privilege should be strictly construed, being in derogation of common law. Culver v. Union Pacific R.R. Co., 112 Neb. 441, 199 N. W. 794 (1924). The party seeking to exclude evidence has the burden of proof to show that the information was obtained by the physician in his professional capacity during his relationship with the patient. Stapleton v. Chicago, B. & Q. R.R. Co., 101 Neb. 201, 162 N. W. 644 (1917). The object of the statute is to enable the patient to secure medical services without fear of betrayal, and not to disqualify physicians as witnesses. Falkinburg v. Prudential Ins. Co. of America, 132 Neb. 831, 273 N. W. 478 (1937). See, also, 81 Am. Jur. 2d, Witnesses, § 231, p. 262.

The essential elements which must exist before the privilege can apply are generally said to be as follows: (1) A physician-patient relationship: (2) information acquired during this relationship; and (3) the necessity and propriety of this information to enable the physician to treat the patient skillfully in his professional capacity.

In order for the privilege to apply, there must exist a physician-patient relationship. This relationship can be formed by the fact of treatment of an injured person by a physician.

In State v. Staat, 291 Minn. 394, 192 N. W. 2d 192 (1971), it was held that where hospital physicians were required to give diagnosis and treatment to the defendant who was brought in unconscious to the hospital emergency room, a confidential relationship developed between the defendant and the hospi-

tal physician. The defendant's unconscious state did not militate against the relationship. In Carlton v. Superior Court of Los Angeles County, 261 Cal. App. 2d 282, 67 Cal. Rptr. 568 (1968), it was held that the relationship of physician and patient existed between the defendant motorist, who was taken to the hospital for treatment of injuries sustained in an accident, and the physicians at the hospital who undertook to examine, diagnose, and furnish curative treatment from the time of his arrival at the hospital until his discharge. A physician-patient relationship clearly existed between Wilkinson, who was brought to the hospital unconscious, and Dr. Post who was called upon to examine and treat him.

The blood sample was withdrawn from Wilkinson by Mrs. Hadden at the direction of Dr. Post. The physician-patient privilege extends not only to physicians but to their agents as well.

As stated in Culver v. Union Pacific R.R. Co., *supra:* "A professional nurse assisting a physician to whom such confidential communications have been made by a patient is an agent of the physician. She stands in the same relation of confidence to the patient and may not be permitted to testify to such communications unless the privilege has been waived by the patient."

The next factor to be determined is whether the extraction of a blood sample comes within the contemplation of the privilege. The physician-patient privilege protects not only statements made by the patient to the physician, but also facts obtained by the physician by observation or examination. Bryant v. Modern Woodmen of America, 86 Neb. 372, 125 N. W. 621 (1910). In Stapleton v. Chicago, B. & Q. R.R. Co., *supra,* it was held that when one submits to an examination, the knowledge so acquired by the physician is privileged. In Freeburg v. State, 92 Neb. 346, 138 N. W. 143 (1912), it was held that a doctor who dressed the wound of the defendant, who

was accused of drunkenness, was incompetent under the statute then reciting the physician-patient privilege to testify as to his observations of the defendant's drunken condition during treatment.

The taking of a blood sample from a patient clearly comes within the contemplation of the physician-patient privilege. The plaintiff cites the Supreme Court case of Schmerber v. California, 384 U. S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), which recognizes the distinction drawn between oral communications and physical evidence, e.g., a blood sample, for purposes of the Fifth Amendment. See, also, State v. Oleson, 180 Neb. 546, 143 N. W. 2d 917 (1966); State v. Swayze, 197 Neb. 149, 247 N. W. 2d 440 (1976). The plaintiff points out that section 27-504, R. R. S. 1943, speaks of "communications" between the physician and patient and argues, based upon the above, that the blood sample is not a "communication." The above distinction is relevant only to Fifth Amendment analysis and has no application to the physician-patient privilege. Extraction and analysis of a blood sample is clearly within the contemplation of the privilege.

The plaintiff argues that the physician-patient privilege does not apply to the results of the blood alcohol test because of the provisions of the implied consent statute, section 39-669.08, R. R. S. 1943. It has been held that a blood sample secured pursuant to an implied consent statute is not information within the purposes of a physician-patient privilege statute because the sample is taken only for blood alcohol tests and not for diagnosis or treatment of the patient. See, e.g., State v. Erickson, 241 N. W. 2d 854 (N.D., 1976).

In State v. Howard, 193 Neb. 45, 225 N. W. 2d 391 (1975), we held: "The provisions of the implied consent statutes are applicable only to prosecutions for offenses arising out of acts alleged to have been committed while the person was driving or was in

the actual physical control of a motor vehicle while under the influence of alcoholic liquor.'' We have also held that for an implied consent to be effective the person from whom the blood sample is taken must have been arrested or else taken into custody before the test is given. State v. Baker, 184 Neb. 724, 171 N. W. 2d 798 (1969); Prigge v. Johns, 184 Neb. 103, 165 N. W. 2d 559 (1969). This case is a civil action, wrongful death, not a criminal prosecution. The defendant was never under arrest or in custody. The implied consent statute has no application here.

To be privileged, information obtained during the existence of a physician-patient relationship must be necessary to enable the physician to properly discharge his duties. See, VIII Wigmore on Evidence, § 2383 (McNaughton Rev. Ed., 1961); Koskovich v. Rodestock, 107 Neb. 116, 185 N. W. 343 (1921). Where the information is not obtained for this purpose, it is not privileged. Nichols v. State, 109 Neb. 335, 191 N. W. 333 (1922).

In State v. Bedel, 193 N. W. 2d 121 (Iowa 1971), the court found that neither the certification to withdraw the defendant's blood following his arrest for driving while intoxicated, nor the blood test itself, were related to either medical diagnosis or treatment of the defendant, and held that the results were not privileged because there was no showing that they were necessary and proper to enable the physician to treat the patient. The physician did not see the defendant personally until the next morning, nor was there any showing that the nurse was ordered by the doctor to take the test.

In Hanlon v. Woodhouse, 113 Colo. 504, 160 P. 2d 998 (1945), the court, in holding in a civil action that the physician-patient privilege was not violated by the doctor's testimony to the effect that an analysis of a blood sample taken from the defendant driver while he was unconscious showed sufficient blood alcohol to cause a state of drunkenness, stated that

since the blood alcohol test was not necessary to enable the physician properly to treat the defendant after the accident, but was rather made in obedience to a request from a police officer, it was not encompassed by the physician-patient privilege.

In State v. Amaniera, 132 N. J. Super. 597, 334 A. 2d 398 (1974), the court held that the fact the police were standing by and were prevented from acting to request a blood test only by reason of the ongoing medical attention being given to the defendant after he was taken to the hospital for emergency treatment following an automobile accident did not preclude the application of the physician-patient privilege to the results of tests for alcohol performed on the defendant's blood, pursuant to the physician's order which was motivated by medical reasons.

In Ragsdale v. State, 245 Ark. 296, 432 S. W. 2d 11 (1968), the court held that the result of a blood alcohol test run on the defendant for the purpose of proscribing and treating his injury, which was sustained in an automobile accident in which one person was killed, and not at the request of a police officer or the prosecuting attorney, was privileged.

Alder v. State, 239 Ind. 68, 154 N. E. 2d 716 (1958), involved a prosecution for involuntary manslaughter. While the appellant in that case was lying unconscious in the hospital, a physician who was on call took a blood sample from the appellant in order to determine his blood type preparatory to giving him a blood transfusion. A State Police officer, who was present at the time, requested the physician to take a sample of the appellant's blood for him for the purpose of making an alcoholic test. After the physician had drawn about 15 cubic centimeters of blood, he instructed a nurse, who was present and assisting him, to give one-half of it to the State Police officer, who then forwarded the sample to the State Police laboratory in Indianapolis for analysis. The appellant contended that it was error to allow the physi-

cian to testify that he took the blood sample from the appellant because the transaction was privileged. The Supreme Court of Indiana agreed with the appellant's contention. In support of its holding, the court cited one of its previous decisions, Chicago, S. B. & L. S. Ry. Co. v. Walas, 192 Ind. 369, 135 N. E. 150 (1922), in which it had held that a physician was precluded from testifying as to his opinion of the defendant's intoxicated status based upon his observations of the defendant in the emergency room. We note that the Walas case is similar in its holding to our case, Freeburg v. State, *supra*. The Indiana court stated: "If a physician may not testify from observation whether or not in his opinion a patient on whom he was about to perform an operation was intoxicated, it would seem logically to follow that a physician may not, without the patient's consent, give a sample of his blood which he had drawn 'in the course of his professional business' to a policeman to ascertain the alcoholic content, for the purpose of determining whether or not such patient was at the time under the influence of intoxicating liquor." 239 Ind. at 75, 154 N. E. 2d at 720.

The court further stated: "In the case at bar the patient was unconscious and was completely in the trust and care of the physician. If, under such circumstances, a physician is prohibited by statute from testifying as to the intoxicated condition of the patient, it is our opinion that the statute would also prohibit testimony of a physician concerning a sample of blood which he took from the patient and caused to be delivered to the State Police officer to be used in determining the alcoholic content of the blood. This clearly was information obtained by the physician 'in the sick room' and it was error to overrule appellant's objection to testimony concerning the same" 239 Ind. at 76, 154 N. E. 2d at 720.

Dr. Post testified that he ordered the blood sample withdrawn from the defendant. He stated that it

was done for medical reasons. As stated earlier, there is no evidence that the sample was withdrawn at the request of any law enforcement officer. The fact the sample was later made available to law enforcement authorities for the purposes of blood alcohol testing did not effect its privileged status. We hold that the blood sample and the results of the blood alcohol test were privileged under the physician-patient privilege.

The plaintiff draws our attention to the rule currently stated in section 27-504 (4)(c), R. R. S. 1943, to the effect that there is no physician-patient privilege regarding communications relevant to the physical, mental, or emotional condition of the patient in any proceeding in which the patient places his condition into issue, either as an element of his claim, or defense. In her petition the plaintiff alleged that the defendant was intoxicated. In his amended answer, the defendant denied that he was under the influence of alcoholic liquor to a perceptible degree. The plaintiff argues that by thus denying her allegations of intoxication, the defendant put his physical condition into issue and thus no privilege exists regarding matters relevant to that issue. We disagree with the plaintiff's contention.

In Carlton v. Superior Court of Los Angeles County, *supra,* the court stated: "So far as relevant here, section 996 of the Evidence Code reads: 'There is no privilege under this article as to a communication relevant to an issue concerning the condition of the patient if such issue has been tendered by: (a) the patient * * *.' Plaintiff contends that by his denial of the allegation in the complaint that defendant was intoxicated at the time of the accident, defendant 'tendered' the issue concerning his condition which must be decided by the court at the trial of the action. We cannot agree with this contention. * * *

"We hold that the case before us does not fall within the exception relied on by plaintiff, and that

defendant is entitled to the benefit of the privilege * * *.'' 261 Cal. App. 2d at 289, 290, 67 Cal. Rptr. at 573.

The purpose behind the patient-litigant exception to the physician-patient privilege is to prevent the patient from making his condition an element of the dispute, and then invoke the privilege to prevent the opposing party from ascertaining the true condition of the patient. We do not believe that this exception should be invoked where the patient merely denies allegations by the opposing party concerning his condition. Were we to adopt plaintiff's argument, the defendant would be placed in the position of either admitting plaintiff's allegations of intoxication, or else foregoing the privilege. We do not believe that the physician-litigant exception was intended to work such a result.

It is argued that even if the physician-patient privilege attached to the blood sample and the blood alcohol test results, it was waived by the defendant. The plaintiff finds a waiver in two instances.

In his deposition, the defendant, during examination by the plaintiff's counsel and over objections, stated that he was aware that a blood alcohol test had been conducted on him and that his mother and father told him that the blood alcohol was 0.10 percent. We do not find this to be a waiver of the privilege. In Larson v. State, 92 Neb. 24, 137 N. W. 894 (1912), it was held that where the defendant, without objection, answered questions of the prosecuting attorney upon cross-examination relating to treatment by his physician and the physician's opinion of his condition there was no waiver of the physician-patient privilege by the defendant.

The plaintiff also contends that the defendant waived the privilege when, in his presence and the presence of his counsel, Roger Lott, Morrill county attorney, read into the record during the coroner's inquest into the death of Hubert L. Branch the re-

sults of the blood alcohol test conducted on the blood sample obtained from the defendant. The plaintiff argues that defendant's failure to object constituted a waiver. After the blood alcohol test results were read into the record by the county attorney, the county attorney gave counsel the opportunity to make objections. This opportunity, however, related not to the reading of the blood alcohol test results into the record, but rather to the back half of an accident report put into the record at the same time. This was not a waiver.

"A waiver, according to the generally accepted definition, is the voluntary and intentional relinquishment of a known right, claim, or privilege." 28 Am. Jur. 2d, Estoppel and Waiver, § 154, p. 836. It is apparent from the record that the blood alcohol test results of Wilkinson were known to numerous people. The record, however, is devoid of any indication that the defendant had any control over the dissemination of this information, opportunity to halt or prevent it, or that he approved it. There is no evidence in the record that the defendant ever made the results of the test known to third persons.

Finding that the blood sample taken from the defendant and the results of the blood alcohol test are within the physician-patient privilege, and failing to find any waiver of that privilege by the defendant, it follows that the District Court was correct in granting the defendant's motion to suppress and in refusing to allow the test results to come into evidence.

Next to be determined is whether or not the defendant was entitled to the directed verdict he obtained after the close of the plaintiff's case. The rules for our review of this matter were stated in Collins v. Herman Nut & Supply Co., 195 Neb. 665, 240 N. W. 2d 32 (1976): " 'In testing the sufficiency of the evidence for determining the propriety of a directed verdict, the plaintiff is entitled to have all controverted facts resolved in her favor, and she is entitled to have the

benefits of every inference that can reasonably be drawn from the evidence. * * * Where the facts adduced to sustain an issue are such that but one conclusion can be drawn when related to the applicable law, it is the duty of the court to decide the question as a matter of law and not submit it to a jury.' "

In order for the plaintiff to recover, she had to show that the defendant was either intoxicated or guilty of gross negligence.

Around 11 p.m. on March 8, 1974, the plaintiff's decedent and the defendant were observed together at the Stable Club, a restaurant and lounge in Gering, Nebraska, by Cynthia Kay Baum and several of her girl friends. One of these friends, Joan Earle, testified that the defendant was drinking a beer when she first observed him and that he ordered another beer later that evening. He was drinking "Olympia" beer. Branch, she recalled, had a mixed drink and did not order a beer. John Branch, decedent's son, testified that his father never drank beer, but preferred mixed drinks. Cynthia Kay Baum expressed her opinion that neither Branch nor the defendant appeared to be intoxicated when they all left the Stable Club at approximately 1:15 a.m. She did not see the defendant take anything out, such as packaged liquor. Joan Earle testified that, based upon her observations of the defendant, "I didn't feel he was at all intoxicated." She did not see the defendant buy any beer to take out when they left.

There is no evidence as to what happened between 1:15 a.m. and 3:12 a.m., the time of the accident. It is approximately 45 miles from Scottsbluff to Bridgeport, and approximately 25 miles from Bridgeport to the scene of the accident. Officer Harris, who first arrived at the accident scene and accompanied the ambulances to the hospital, testified that he had not smelled any odor of alcohol or seen any evidence of alcohol in the car. Officer Kling who arrived at the scene to help Officer Harris, and who remained be-

hind after the ambulances left, observed two full cans of "Olympia" beer in the car. Two or three empty "Olympia" cans were also observed in the proximity of the vehicle sometime later. Dr. Post, who was called upon to treat the defendant, stated that he did not remember detecting the odor of alcohol upon the defendant's breath while he was treating him.

The evidence adduced on the issue of intoxication was totally insufficient to warrant submission of that issue to the jury. A jury finding, based upon the above evidence, that the defendant was intoxicated at the time of the accident could only be the result of speculation and conjecture. There was no evidence, at all, concerning the effect on the defendant of the alcohol he consumed. As was stated in Raskey v. Hulewicz, 185 Neb. 608, 177 N. W. 2d 744 (1970): "Where there is no evidence presented as to the effect of intoxicants upon the part of the parties involved, it is not proper to submit that issue directly to the jury."

The accident occurred on U.S. Highway No. 26, east of Bridgeport, Nebraska. The area is fairly level and the road straight, with a slight curve just west of where the accident took place. Officer Harris observed no obstructions on the highway and observed that the paved surface of the highway was only slightly higher than the shoulder of the road. Officer Harris did not recall any moisture or dew on the road. The defendant's vehicle was proceeding in an easterly direction. Starting where the road takes a slight curve to the left, the defendant's car left the highway. It traveled completely off the paved surface, on the shoulder of the road, for about 468 feet, after which it came back onto the paved surface, crossed the centerline, crossed the westbound lane of the highway, and impacted with the north-west corner of a concrete bridge abutment. After striking the bridge abutment, the defendant's

car traveled 69 feet in the air, struck the ground, traveled 36 feet further, then rolled or was airborne another 31 feet, hit the ground a third time, and came to rest another 23 feet further on, or 159 feet from the point of impact. The car was totally demolished, the engine torn out of the car. Debris was strewn along the trajectory of the automobile.

In Luther v. Pawling, 195 Neb. 679, 240 N. W. 2d 42 (1976), we stated: "Gross negligence within the meaning of the motor vehicle guest statute means gross and excessive negligence or negligence in a very high degree; the absence of slight care in the performance of duty; an entire failure to exercise care; or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the safety of others. * * * Negligence that is purely momentary in nature generally does not constitute gross negligence. * * * The burden of proving a cause of action is not sustained by evidence from which the jury can arrive at its conclusion only by mere guess or conjecture. * * * Negligence is never presumed."

The mere happening or occurring of a one-car accident with a bridge or culvert abutment does not, as a matter of law, justify an inference of gross negligence under our decisions.

Resolving all inferences in favor of the plaintiff, as we are required to do, we cannot infer gross negligence from the foregoing facts. There is no evidence as to what caused this accident. The inference is strong that defendant's negligence, if any, was momentary in nature. Luther v. Pawling, *supra;* Brugh v. Peterson, 183 Neb. 190, 159 N. W. 2d 321 (1968); Boismier v. Maragues, 176 Neb. 547, 126 N. W. 2d 844 (1964).

The District Court was correct in granting the defendant's motion for a directed verdict.

We have examined the other issues raised by the plaintiff and find them either to be without merit

or, in light of our above holdings, unnecessary to discuss.

The judgment of the District Court is correct and is affirmed.

AFFIRMED.

WHITE, C. THOMAS, J., dissenting.

The doctrine of momentary inattention is now extended to justify the direction of a verdict on the following facts:

(1) On a clear open highway with a slight curve, a host driver operates his car 468 feet on the shoulder of a highway, comes back upon and then across the right-hand lane, into the left-hand lane, and impacts with a bridge abutment on the left-hand side.

(2) After the collision, the car travels through the air 69 feet, strikes the ground, travels another 36 feet through the air, and lands and either rolls or travels through the air another 31 feet.

(3) The engine of the car is totally torn from the car, lying 3 to 4 feet from the car. The car is demolished.

A jury could *easily* find from the circumstances recited the following acts of negligence: (1) Unreasonable speed under the circumstances; (2) failure to exercise a proper lookout; and (3) failure to have the vehicle under proper control.

The defendant, called as a hostile witness by the plaintiff, admitted that in his answers to interrogatories he stated his expert witness would testify the speed of defendant's automobile could not have exceeded 64.1 miles per hour, another act which, if the cause had been submitted, would support a finding of negligence.

The several acts of negligence alleged, when considered together, would fairly support a finding of gross negligence had the cause been submitted. See Demont v. Mattson, 188 Neb. 277, 196 N. W. 2d 190.

In view of the decision of the majority opinion, the

discussion relating to the physician-patient privilege is unnecessary and dicta.

There was no adequate offer of proof in the trial court. The plaintiff merely offered to prove the percent by weight of alcohol in the blood and did not offer to prove by suitable expert testimony the effect thereof. Raskey v. Hulewicz, 185 Neb. 608, 177 N. W. 2d 744.

"If evidence would be relevant in conjunction with other facts not yet in the record, the offer should be accompanied by an offer to prove those facts at the proper time." 88 C. J. S., Trial, § 80, p. 185. See, also, McCormick on Evidence, § 51, p. 109 (2d Ed., 1972).

The issue of admissibility of the blood alcohol test results is not properly before us and should not have been considered.

McCOWN and CLINTON, JJ., join in this dissent.