80 P.3d 1

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Peter MOSES, Defendant–Appellant.**

**No. 23038.**

Intermediate Court of Appeals of Hawai'i.

Oct. 22, 2002.

Reconsideration Denied Nov. 21, 2002.

Certiorari Granted Nov. 29, 2002.

Susan L. Arnett (Deborah L. Kim, on the brief), Deputy Public Defenders, for defendant-appellant.

James M. Anderson (Caroline M. Mee, on the brief), Deputy Prosecuting Attorneys, City and County of Honolulu, for plaintiff-appellee.

BURNS, C.J., WATANABE and FOLEY, JJ.

Opinion of the Court by FOLEY, J.

On September 16, 1998, Defendant–Appellant Peter Moses (Moses) was charged by indictment with the following offenses:

Count I, Attempted Murder in the First Degree of Earl Haskell in violation of Ha-

waii Revised Statutes (HRS) §§ 705–500 (1993),[1] 707–701(1)(b) (1993),[2] and 706–656 (1993 & Supp.2001)[3];

Count II, Attempted Murder in the First Degree of John Veneri, Sr. in violation of HRS §§ 705–500 (1993), 707–701(1)(b) (1993), and 706–656 (1993 & Supp.2001);

1.  HRS § 705–500 (1993) provides:

    **§ 705–500  Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:

    (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or

    (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

    (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

    (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

2.  In 1998, HRS § 707–701(1)(b) (1993) provided as follows:

    **§ 707–701  (1) Murder in the first degree.** (1) A person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of:

    . . . .

    (b) A peace officer, judge, or prosecutor arising out of the performance of official duties[.]

3.  HRS § 706–656 (1993 & Supp.2001) provides:

    **§ 706–656  Terms of imprisonment for first and second degree murder and attempted first and second degree murder.** (1) Persons convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment without possibility of parole.

    As part of such sentence the court shall order the director of public safety and the Hawaii paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

    (2) Except as provided in section 706–657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawaii paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

    If the court imposes a sentence of life imprisonment without possibility of parole pursuant to section 706–657, as part of that sentence, the court shall order the director of public safety and the Hawaii paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

Count III, Escape in the First Degree in violation of HRS § 710–1020 (1993)[4];

Count IV, Theft in the First Degree in violation of HRS § 708–830.5(1)(b) (1993)[5];

Count V, Place to Keep Pistol or Revolver in violation of HRS § 134–6(c) and (e) (Supp.1998)[6];

4.  HRS § 710–1020 (1993) provides:

    **§ 710–1020  Escape in the first degree.** (1) A person commits the offense of escape in the first degree if the person intentionally employs physical force, the threat of physical force, or a dangerous instrument against the person of another in escaping from a correctional or detention facility or from custody.

    (2) Escape in the first degree is a class B felony.

5.  HRS § 708–830.5(1)(b) (1993) provides as follows:

    **§ 708–830.5  Theft in the first degree.** (1) A person commits the offense of theft in the first degree if the person commits theft:

    . . . .

    (b) Of a firearm[.]

6.  In 1998, HRS § 134–6(c) and (e) (Supp.1998) provided:

    **§ 134–6  Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty.**

    . . . .

    (c) Except as provided in sections 134–5 and 134–9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places

Counts VI and VII, Terroristic Threatening in the First Degree in violation of HRS § 707–716(1)(d) (1993) [7];

Count VIII, Unauthorized Entry into Motor Vehicle in violation of HRS § 708–836.5 (Supp.2001) [8]; and

Count IX, Attempted Unauthorized Control of Propelled Vehicle in violation of HRS §§ 705–500 (1993) and 708–836 (Supp.1998).[9]

Pursuant to a jury trial before the Honorable Marie Milks in the Circuit Court of the First Circuit (circuit court), Moses was convicted of Count I as charged; convicted of the included offense of Attempted Assault in the First Degree in violation of HRS §§ 705–500 (1993) and 707–710 (1993) [10] as to Count II; and convicted as to Counts III–VIII as charged. Judgment was filed on December 8, 1999.

Moses contends the circuit court erred by: (1) failing to instruct the jury regarding his theory of defense that the State failed to prove beyond a reasonable doubt the shootings were the result of a voluntary act; (2) admitting evidence of the drug test results, which detected trace amounts of cocaine metabolite, where the negligible probative value was substantially outweighed by the highly prejudicial impact of cocaine use; (3) instructing the jurors that they could consider "evidence of self-induced intoxication" to prove Moses acted with the requisite state of mind where there was insufficient evidence to conclude that Moses was actually under the influence of cocaine at the time of the shooting; (4) excluding testimony by Moses' firearm expert refuting the State's theory that Moses acted with the requisite intent to kill; (5) allowing Moses to be convicted of theft of a firearm (Count IV) and place to keep firearm (Count V) since the charges merged under HRS § 701–109; (6) imposing mandatory terms of incarceration under HRS § 706–660.1(3) in the absence of proof that Moses recklessly disregarded a substantial risk that the gun he possessed was a semi-automatic firearm; and (7) failing to grant his motion for a new trial.

We conclude the circuit court erred when it admitted drug test results indicating Moses had ingested cocaine and that this error was not harmless beyond a reasonable doubt. We therefore vacate the December 8, 1999 Judgment, with the exception of Moses' conviction and sentence pursuant to Count VIII (Unauthorized Entry into Motor Vehicle) which we affirm, and remand this case to the circuit court for a new trial on the remaining counts.

## I.

## BACKGROUND

The offenses Moses was charged with and subsequently convicted of arose out of a

---

and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

. . . .

(e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.

7. HRS § 707–716(1)(d) (1993) provides:

   **§ 707–716 Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:

. . . .

   (d) With the use of a dangerous instrument.

8. HRS § 708–836.5 (Supp.2001) provides:

   **§ 708–836.5 Unauthorized entry into motor vehicle.** (1) A person commits the offense of unauthorized entry into motor vehicle if the person intentionally or knowingly enters or remains unlawfully in a motor vehicle with the intent to commit a crime against a person or against property rights.

   (2) Unauthorized entry into motor vehicle is a class C felony.

9. This count was dismissed by the circuit court on December 23, 1999, pursuant to the State's motion for nolle prosequi.

10. HRS § 707–710 (1993) provides:

   **§ 707–710 Assault in the first degree.** (1) A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person.

   (2) Assault in the first degree is a class B felony.

shooting incident that occurred on September 11, 1998, near the Makapuʻu Lighthouse access road.

Moses testified that on September 11, 1998, he was twenty years old, was approximately six-feet tall, and weighed approximately 250 pounds. On that date, he had gone to the Makapuʻu Lighthouse access road with a screwdriver to steal money from cars. Moses had selected a white Pontiac (white car) and gained access to the car through the passenger door by taking out the keyhole.

That same day, Police Officers Earl Haskell (Haskell), Laura Chong (Chong) and John Veneri, Sr. (Veneri) (collectively "the officers") were assigned to the Beach Task Force. Their duty was to patrol the area between Hanauma Bay and Makapuʻu Lighthouse to deter thefts. Haskell and Chong were dressed in the Honolulu Police Department (HPD) uniform: shirt with police badge and insignia, bike shorts, and gun belt. Veneri was dressed in plain clothes: shirt, shorts, and tennis shoes, with his gun belt and handcuffs under the shirt. Chong and Haskell each carried a Smith & Wesson nine-millimeter semi-automatic, and Veneri carried a Glock nine-millimeter firearm. Veneri's gun was loaded with fifteen rounds of ammunition in the magazine and one in the chamber.

Haskell testified that shortly before 1:00 p.m., he, Chong, and Veneri were at Sandy Beach watching a taping of the Hawaiian Moving Company. At approximately 1:00 p.m., Haskell left Sandy Beach in his HPD-marked vehicle to make a routine check of the cars parked at the Makapuʻu Lookout. He saw nothing unusual in the area and headed back toward Sandy Beach.

· A bicyclist waved to Haskell to stop, and Haskell pulled over. The bicyclist reported that he saw a male at a white car down the road and "that it looked like the guy was breaking into the car." Haskell could see the white car parked on the Makapuʻu-bound side of the road. He drove down and parked across the street from it. Haskell looked at the white car and saw a person's hand on the steering wheel and then a head pop up. Haskell identified Moses as being the person he saw in the car. Believing this was an unauthorized entry into a motor vehicle case, Haskell called Veneri and Chong for backup.

Haskell got out of his car because·Moses was attempting to cross the street to approach him. Before Haskell said anything, Moses stated, "[t]his is my family's car. They went hiking. I came to grab some things and I'm going to go back up the trail to meet them." Haskell responded, "[o]kay, just stay across the street, you know, let me get some information. If everything checks out, it's cool, you can go."

Haskell crossed the street and stood in front of the white car with Moses. Moses carried a bag rolled up in his hand. Haskell took notice of Moses' size because, as a possible suspect in a crime, someone bigger and heavier than Haskell might be stronger. Haskell testified that Moses looked "really nervous" and "agitated," seemed "pissed off" because Haskell was delaying him, and would not stand still. Moses' eyes appeared glassy, red, and unblinking (to Haskell, the unblinking was a "sign of being on ice"). Haskell was concerned for his safety because of the way Moses continued to pace. Haskell asked Moses if he could take the bag from Moses' hand. Haskell took the bag and placed it on the hood of the white car. He then had Moses sit down on the front of the car. Haskell noticed the passenger-side door lock of the white car was severely damaged.

Haskell testified that as Chong and Veneri's cars approached, Moses said to Haskell, "[o]kay, okay, bruddah, I going tell you the truth. This isn't my family's car." Haskell responded, "[y]eah, I noticed the lock." Moses asked him, "[y]ou can help me out or what?" Haskell said, "[w]ait till these two officers come up here." Haskell noticed Moses appeared more nervous, stood up, and started pacing. Chong arrived first and parked to the left of the white car, and Veneri parked behind Chong's car. Moses started to walk away between the white car and Chong's car. Haskell told him to "get back," but Moses did not come back. Chong, who had gotten out of her car, said "get over here," grabbed Moses' arm, and brought Moses back to the front of the white car.

Haskell asked Moses to sit down. Moses sat facing the road on a concrete pillar located in front of and to the passenger side of the white car. Behind where Moses sat was a steep embankment, some kiawe [11] trees, and a dirt and gravel trail. Haskell stood about three feet in front of Moses, to Moses' left and next to the white car. Chong stood about the same distance to Moses' right. Veneri stood in front of Moses. Haskell reported to Veneri that Moses "pretty much admitted to breaking into the car." Haskell informed Moses he was going to be arrested. Moses said nothing, just remained sitting and looked side to side. Haskell noticed that Moses was "gritting his teeth." Haskell approached Moses from behind, told Moses he was going to be arrested, and went to handcuff him. Haskell did not have Moses stand up. Haskell reached for Moses' left hand, but before Haskell could get the handcuffs on him Moses stood up and started swinging his arms, knocking the handcuffs from Haskell's hand.

Chong tried to subdue Moses, but Moses kicked her and she fell down. Veneri then moved toward Moses and tried to grab him. It appeared to Haskell that Moses and Veneri were in a "slight struggle." Haskell was behind Moses as Haskell and Veneri tried to "take him down." Haskell identified Moses as the aggressor at that point, stating that Moses appeared to be grabbing Veneri with both arms in a bear hug type of hold. Haskell attempted to grab Moses' left arm and push him over so they could get him to the ground and get his arms behind his back. Haskell testified that with one arm around Veneri, Moses was "pretty much lifting [Veneri] off the ground."

As Haskell and Veneri were getting Moses to the ground, Veneri let go of Moses and rolled out to the side. While Haskell was still holding Moses' arm, Moses' weight carried Haskell with him and Haskell fell "over on top of Moses." Haskell testified that Moses was "sort of on his knees leaning over on ... a rock or a pillar or something" and that he [Haskell] was lying flat on his stomach over Moses' legs, facing Moses' back. As the men were falling and after Veneri rolled out, Haskell heard Veneri yell, "[g]un, watch out, gun." Haskell testified he was "pretty much shocked" because he had patted down Moses before he attempted to handcuff Moses. Haskell testified that "the only thing [Moses] had on him was a screwdriver in his pocket." Haskell had tossed the screwdriver on the ground behind him, towards the white car.

Still hearing Veneri yelling, "gun, gun," Haskell saw a black handgun in Moses' right hand. Haskell was still surprised and wondering where the gun came from. Moses stood up, and, by the time Haskell pulled himself up by grabbing the back of Moses' shirt, Moses was already turning around. Haskell grabbed Moses' left arm and tried to push Moses away. Haskell saw the gun "coming around and it came under [Moses'] left hand." Moses looked at Haskell, saying: "[c]ome on, you fucker, come on." Haskell heard the gun go off. Haskell testified it "felt like somebody had shoved me in my stomach." At that point Haskell could not move his legs and fell to the ground on his stomach. Haskell testified he turned his head to the left to look up and saw Moses "pointing the gun at my head." Haskell could not gauge how close the gun was, but stated, "I was looking right in the barrel and he kept saying, 'Come on, you fucker, come on.'" Haskell testified, "I started to cringe and turn my head away because I—all I was thinking of was an impact." Haskell thought Moses was going to shoot him in the head.

Haskell heard Veneri yell, "[g]o, go" or "go, run." Haskell saw Moses move his right hand, which was holding the gun, toward Veneri's direction, and Haskell pushed himself up and ran into the bushes. Haskell knew he had been shot. Once he was in the bushes, Haskell took out his handgun. When Haskell turned around, Moses was gone. Haskell was walking backwards down the trail (because he had no idea where Moses was) when he saw Veneri come around the white car and heard Veneri yell, "[d]rop the

---

11. A "kiawe" is an "Algaroba tree (*Prosopis pallida*), a legume from Peru, first planted in 1828 in Hawai'i, where, in dry areas, it has become one of the commonest and most useful trees." Mary Kawena Pukui & Samuel H. Elbert, *Hawaiian Dictionary* 146 (rev. ed.1986).

gun, drop the gun." As Haskell made his way back down the trail he heard gunshots. He could not see who was shooting. Haskell testified:

Well, I remember hearing the shots, trying to call—notify dispatch that shots were fired, that I'd been shot, that I needed an ambulance. As I—I—I heard [Veneri] yelling, "Drop the gun," I heard the shots, I had my gun out. I tried to walk back up the trail. I took like, one step and I—I fell down. And I noticed that I was sitting on my legs and—it looked like—like such an uncomfortable position but yet I couldn't—I couldn't feel my leg.

Haskell thought his spine was probably damaged. He looked to his left side, saw "all this blood," and thought "this fucker just killed me."

The shooting stopped, and Veneri came down to find Haskell. Haskell rode to Sandy Beach in an ambulance and was then medevaced to Queen's Hospital. For two months he remained at Queen's Hospital, where he underwent surgeries to repair damage to his colon and small intestines. He had subsequent hospitalization and treatment for a possible blockage in his intestines.

Veneri testified that during the attempt to arrest Moses, the officers struggled to handcuff Moses. When Veneri grabbed Moses by the right hand, Moses flung his arm away with enough force that Moses released Veneri's grip on him and moved Veneri to the side. Veneri described the struggle to get Moses handcuffed as feeling like "we were in a fight for our lives," but the officers were unable to get Moses to comply. Veneri attempted to execute a hair-pull take-down technique, combined with a knee thrust to the large muscle groups in Moses' legs, in an effort to get Moses to the ground, with no effect on Moses. Instead, Moses forcefully kneed Veneri in the groin and the stomach areas.

Veneri testified that as he continued in his efforts to get Moses to the ground, Moses fell forward and grabbed Veneri's waist. Veneri's gun was holstered on his left hip. Veneri testified he "immediately felt [Moses'] right hand, when [Moses] grabbed my waist, . . . grab my weapon." Veneri locked his left elbow down on the gun to try and retain his weapon and tried to hold on to Moses' hand, but was unsuccessful. Moses again kneed Veneri in the stomach, and the two men fell backwards.

As he fell, Veneri felt his gun come out of its holster. He watched Haskell get knocked over and fall over the cement pillar, and Haskell and Moses ended up on the ground together. Veneri saw his gun in Moses' right hand and yelled, "[g]un." Veneri heard a shot, but did not see who fired the gun, and then heard Haskell moan. Veneri yelled at Chong to go and reached out to pull her so she would take cover by the side of her car. When Veneri yelled, he drew Moses' attention, and Moses turned around and pointed the gun at Veneri and Chong. Chong and Veneri started running alongside Chong's vehicle for cover as Moses started to come up the embankment. Veneri was unaware of where Haskell was at this point or what had happened to him. As Chong and Veneri moved towards the rear of Chong's vehicle, Veneri took Chong's gun and told Chong to go take care of Haskell while he dealt with Moses.

Positioned at the rear of Chong's vehicle, Veneri saw that Moses had run across the street to Haskell's vehicle and had opened the driver's side door. Moses was crouched behind the door and appeared to be reaching into the car with his right hand. Veneri assumed Moses was "trying to take the car, start the vehicle." Veneri yelled to Moses to drop the gun and give up. Veneri saw Moses lean out from behind the door and, with his left hand, Moses pointed the gun in Veneri's direction and fired a shot. Interpreting that as a threat on his life, Veneri returned fire. Veneri knew Chong's nine millimeter pistol carried one round of ammunition in the chamber and fifteen rounds in the magazine. Although he did not count the number of times he fired Chong's gun, Veneri assumed he fired sixteen rounds "very fast."

Veneri testified he directed his gunfire at the car door hoping to hit Moses through the door and stop him before Moses took the vehicle. After Veneri finished firing, the slide on the gun came back and locked in the

rear position, indicating to Veneri that he had emptied the ammunition. Veneri called out to Chong that he was out of ammunition and needed another magazine. Chong ran from the front of her car back to where Veneri was positioned and threw another magazine on the trunk of her vehicle. Veneri reloaded.

Moses had climbed into Haskell's car and was seated, in a half hunched-over position, behind the wheel of the vehicle. Veneri saw Moses' hand come up with the gun in it through the crack between the open door and the windshield area; then Moses' head came up. Moses pointed the gun at Veneri, and Veneri fired his gun at Moses. Moses dropped back down on the car seat. Moses' hand and head came up a second time, with Moses' gun pointed from behind the windshield in Veneri's direction. Veneri fired one round. Moses dropped down, moved further towards the passenger door, raised his hand and pointed the gun in Veneri's direction, and then raised his head. Veneri fired again. Veneri was out of ammunition and called to Chong to bring him another magazine.

After reloading, Veneri observed the passenger side door of the vehicle open and Moses crawl out and "flop on the ground" alongside the vehicle. Veneri moved toward Moses and observed Moses lying face down on an embankment. Veneri yelled to Moses to put his hands where Veneri could see them, and Moses put his hands above his head. Veneri asked Moses where the gun was, and Moses made a pushing or sweeping motion with his left hand and mumbled something Veneri could not understand. Moses had pushed the gun out from under his body towards his feet. As he got closer to Moses, Veneri observed his gun on the ground next to Moses. Veneri picked up his gun, which was covered with blood, and put it back in his holster. Veneri then handcuffed Moses.

Kaulu Kauwe (Kauwe) testified that on September 11, 1998, he and his cousins (collectively, the group) parked their car outside the gate at the base of the Makapu'u Lighthouse access road. Kauwe saw a police officer (first police officer) talking to a local guy (Moses) in front of a white car parked on the lighthouse side of the road. As the group prepared to set off on a hike, Kauwe approached the first police officer to ask if it was all right to park his car by the gate. Kauwe testified he heard the first police officer telling Moses to sit down because two other officers were on their way.

Kauwe described Moses, as "jittery" and "kind of nervous, like swearing under his breath kind of thing." Kauwe testified he saw a female police officer and a plainclothes officer arrive. The officers told Moses to stand up and put his hands behind his back. Kauwe saw Moses resist, and the three officers and Moses began to struggle and scuffle. The plainclothes officer broke away from the scuffle and then tried to jump back in. Kauwe heard a gunshot and saw the first police officer run down the trail beyond the gate holding his stomach. Kauwe then heard a lot more gunshots. Kauwe heard the plainclothes officer yelling "drop the gun."

Kauwe went to help the first police officer who had run down the trail. When he reached the officer, Kauwe saw that the officer was down on his knees holding his stomach and was in pain. Kauwe testified that when the shots came to an end, the plainclothes officer ran over looking worried and asked him, "[w]here's Puni, where's Puni?" When Kauwe indicated where the injured officer was, the plainclothes officer said, "[o]h, oh, sorry, Puni, sorry."

Dr. Steven Nishida (Dr. Nishida) testified he was a general surgeon on duty at Queen's Medical Center emergency room (Queen's) when Moses was brought in by ambulance on September 11, 1998. Dr. Nishida described Moses' condition upon arrival at Queen's as stable, although Moses had sustained approximately sixteen gunshot wounds to various parts of his body. Dr. Nishida described gunshot wounds as being very unpredictable with the ability to inflict a lot of damage and stated that with more than one wound, the risk increases that there are serious injuries. Dr. Nishida was most concerned with the gunshot wounds located in critical areas: (1) two wounds to Moses' scalp that appeared superficial, and (2) one wound to Moses' neck just left of the midline (the front of the neck). Dr. Nishida was mostly concerned with the

neck wound because major blood vessels lie in the area around the windpipe and esophagus and an injury there could lead to dangerous complications.

Dr. Nishida performed a CT scan on Moses that showed no injury to Moses' brain, but did show a bullet fragment left in Moses' scalp. An x-ray showed bullet fragments in Moses' chest. Dr. Nishida also performed arteriograms to test the integrity of the vessels leading to Moses' brain (due to the neck wound) and the vessels in his leg (due to several leg wounds).

Dr. Nishida testified that in addition to these tests, he ordered a standard toxicology screen. Diagnostic Laboratory Services (DLS) performed the toxicology screens for Queen's. Dr. Nishida ordered the screen for several reasons. The screen aids in the evaluation of the patient's mental status. Dr. Nishida testified that if the patient appears "at all confused or not quite with it, it's important to know whether there's an actual head injury or whether this is because of alcohol or drugs." Dr. Nishida indicated that the screen aids in the physician's evaluation of the patient's cognitive status (whether the patient suffered a concussion secondary to the scalp gunshot wound). Dr. Nishida acknowledged that to "some degree" the screen prevents harmful drug interaction conditions.

Dr. Nishida testified he believed the toxicology screens were necessary for his diagnosis and treatment of Moses. He testified Moses' that blood screen tested positive for cocaine metabolites and Moses' urine screen tested positive for cocaine. Based on a review of his notes, Dr. Nishida had no recall of anything unusual about Moses' behavior or any concern that Moses was under the influence of drugs. Dr. Nishida testified that his notes indicated Moses was "oriented times three, that is, he knew his name, he knew the date, he knew he was in the hospital."

The State called Dr. William Freze Haning (Dr. Haning) to testify. Dr. Haning testified he was a board-certified addiction psychiatrist licensed to practice medicine in the State of Hawai'i. He testified cocaine is capable of suppressing appetite and the need for sleep; enhancing one's momentary attention and ability to focus or concentrate; and

acting as an aphrodisiagenic and euphorigenic (a drug that makes one feel happy). As use and frequency increase, cocaine can cause paranoia, fearfulness, irritability, agitation, and an increasing willingness to be aggressive and defend oneself against perceived threats. At its most intense, the effects of cocaine may include hallucinations and delusions.

Dr. Haning testified cocaine's half-life (how long it takes before half of the drug is destroyed by the body) is "generally not much more than about 70 minutes." Cocaine breaks down into several residual products unique to cocaine; one of these products is benzolecgonine, which has a half life that can range from four hours up to twelve hours. As a result, benzolecgonine may be measurable in blood or urine for a range of twenty-four to seventy two-hours. Cocaine is measurable in urine longer than in blood in part because (1) urine tests represent what is concentrated in the kidneys after a filtering process so there will be more cocaine per millimeter, per unit of volume in the urine than will be present in the blood; and (2) the bladder acts as a "collecting vessel" for the body and gives a more sensitive picture of whether an individual has ingested cocaine during the preceding day or so. Moses' comprehensive serum drug screen (blood test) showed the presence of cocaine metabolite benzolecgonine (no quantity was given, only that it was detected). Moses' urine test was positive, indicating it was above a threshold of 300 nanograms per milliliter (the minimum concentration of cocaine necessary to produce a positive result). Dr. Haning testified that Moses' test results indicated the presence of cocaine metabolites and that Moses would have had to ingest cocaine, as opposed to some other substance, to get those test results. Dr. Haning testified there was an 80% probability that Moses ingested the cocaine within twenty-four hours before the blood test and a 20% probability that Moses ingested it prior to twenty-four hours.

Following Dr. Haning's testimony, the circuit court gave the following instruction:

The prosecution has introduced evidence that defendant Peter Moses tested positive for cocaine metabolites shortly after he

was admitted to Queen's Medical Center on September 11, 1998.

Defendant's possible intoxication from cocaine use may not be considered by the jury as a defense to any of the offenses charged and may not be used to disprove that defendant acted with the required mental state for any offense. However, evidence of intoxication at the time of the conduct charged may be considered by the jury in deciding if defendant acted in any relevant manner or had any relevant state of mind to prove any of the offenses charged.

Curtis Kubo (Kubo), an HPD criminalist, testified he was assigned to the Firearm and Tool Marks Examination Unit. Kubo test fired firearms for operability, made comparisons involving fired bullets and cartridge cases, determined the distance between a firearm and its target, and performed serial number restorations and other related examinations dealing with firearms and ammunition. He examined and tested the three firearms belonging to Veneri, Chong, and Haskell. Kubo examined and tested Veneri's Glock nine-millimeter firearm and determined that the necessary pull on the Glock's trigger in order to fire it was approximately nine and a quarter to nine and a half pounds and it could not fire without a finger on the trigger. Of the thirty-three fired cartridge cases recovered, Kubo identified two cartridge cases as being fired from Veneri's Glock (one case was on the ground and one was in the chamber of the Glock) and thirty-one cartridge cases as being fired from Chong's gun. Kubo concluded that Veneri's Glock fired two shots.

Moses testified on his own behalf that when he first saw Veneri and Chong arrive, he walked toward them to see if they would give him a break because he had confessed to breaking into the white car and had returned the bag he had taken from the white car. Officer Chong grabbed Moses by his right arm and told him to sit on one of the pillars in front of the white car. Officer Haskell asked Moses if he had anything in his pockets. Moses said yes, pulled a screwdriver from his right pocket, and handed it to Haskell.

The officers looked at the broken keyhole on the white car and talked with one another before approaching Moses, who was still seated on the pillar. Chong told Moses to stand up. Chong turned Moses around so he was facing the lighthouse and the embankment incline. Haskell grabbed Moses' left wrist and pulled Moses' arm behind Moses to handcuff him. When Haskell pulled Moses' arm behind Moses, it was painful, and Moses pulled his hand away from Haskell. Chong and Veneri grabbed Moses' right hand, trying to get Moses' hand behind Moses' back. Moses forcefully moved his hands from the back to the front. Veneri grabbed Moses by the top of Moses' hair while Chong and Veneri held Moses' arms. Moses' upper body was then bent parallel to the ground.

Fearing he was going to lean forward and fall on his face, Moses freed his arm from Chong's grasp and tried to brace himself by grabbing Veneri's waist. The struggle continued, with the four of them shuffling back and forth while Veneri held Moses by the head, Chong and Haskell tried to push Moses down, and Moses tried to keep from falling by standing with his feet far apart.

Moses saw a black gun on the ground in front of his left foot; he had no idea where it came from. Moses could no longer keep his balance and fell face down on the ground with the gun beneath him. Moses stood up with the gun in his right hand. Moses testified he did not know why he picked up the gun. When asked how he picked it up, he replied, "[w]as just there. I just wen grab um" and "I never see where my hand was. I just wen pick up one object. I never tell myself for put my finger any place." Moses did not know if his finger was on the trigger.

Moses testified that when he stood up he was facing the Makapu'u Lighthouse and Veneri and Chong were running between the white car and one of the police cars. Haskell grabbed Moses' left arm to move it to Moses' back, and Moses spun around and moved with Haskell. Haskell then grabbed Moses' right hand (which still held the gun) and put it behind Moses' back. Standing below and behind Moses on the incline of the embankment and holding Moses' hands behind Moses' back, Haskell pulled Moses backward to

the pillar and stepped over the pillar. When Moses reached the pillar he started falling backwards, and both Moses and Haskell fell. Haskell's hand was over Moses' hand, which was still holding the gun. As the two men fell, Moses heard "that shot go off." Moses testified he did not know who pulled the trigger or how the gun went off, but acknowledged the gun was in his hand when he heard the shot. Moses was not sure if Haskell's hand ever touched the gun.

Moses testified that after hearing the shot, he was sitting on the ground and Haskell was bent over. The gun was still in Moses' hand. Moses looked at Haskell and Haskell's eyes were "big" and "black and pain," and Moses felt scared.

Moses testified he turned over to stand up and braced himself with his right hand (which still held the gun) to go back up the incline. As he was turning over, his right hand and the gun hit the ground, and he saw dirt fly. Moses testified that at the time he was unaware that the gun had fired a second time.

Moses got up and ran across the street to hide because he was scared. Moses ran to Haskell's car because it was the first thing he saw. Moses stated he guessed the gun was still in his right hand, although he did not know at the time that it was. As Moses opened the car door with his left hand, he was hit in the back of his leg by a bullet from Veneri's gun. Moses got up and threw himself into the car. Moses was lying on his back in the car and saw a bullet shatter the car door and hit his right knee. He pulled his feet into the car.

Moses got up to look across the street to see exactly where Veneri was, and a bullet hit Moses in the head. The gun was still in his right hand, which was on the passenger seat of the car. Seeing blood rushing, Moses closed his eyes and leaned back down. He wiped his face and put his head back up to see if Veneri would stop. When Moses put his head up, he felt a bullet hit his throat. Moses stated that after getting shot in the throat, he decided he was not going to look again and would just stay down.

Moses testified that staying in the police car was not working, so he wanted to get out. The gun was still in his right hand. Moses realized he had the gun in his hand when he first got in the car, but was not thinking about the gun while being shot at. Moses testified he did not know why he picked up the gun in the first place or why after "all the action that wen follow after that" he did not notice the gun again until after he entered the police car. Moses stated he did not drop the gun when he saw it in his hand as he got in the police car because he was in pain and had ringing in his head.

Moses testified he reached out with his hands and dropped the gun out of the passenger door of the car onto the road. He dropped the gun because he needed to plant his hands in order to push the rest of his body out of the car. Moses could not use his legs to push out of the car because he could not feel his legs. Moses landed on the ground with the gun beneath his stomach and his hands above his head. Veneri approached him asking, "[w]here's the gun?" Moses indicated beneath him by pointing and then shoved the gun from underneath him to his left. Moses picked up the gun, and Veneri grabbed the gun from Moses.

Moses testified that when he picked up the gun, he did not intend to shoot or hurt anyone nor use it to protect himself if anyone hurt him. While Moses had the gun in the police car, he did not intend nor try to use it. He did not know what kind of gun it was, and he had never fired a gun. Moses did not intend to kill Haskell or Veneri.

## II.

## PHYSICIAN–PATIENT PRIVILEGE

On August 6, 1999, the State filed "State's Motion in Limine No. 2" requesting the circuit court "to grant an order permitting the State to introduce evidence that upon Defendant's admission to Queen's Medical Center a standard toxicology screening revealed the presence of cocaine." In support of the motion, the deputy prosecuting attorney submitted his declaration, which stated in part:

2. The instant case involves the shooting of an on-duty police officer at Makapuu on September 11, 1998.

3. During the incident, Defendant was shot and was transported by medivac [sic] to Queen's Medical Center for treatment.

4. Soon after arrival at the emergency room, he was examined and treated by medical personnel.

5. As part of standard hospital protocol, a toxicology screening was ordered to assist in the Defendant's treatment.

6. The toxicology screening revealed the presence of cocaine.

7. The State seeks to introduce this evidence at trial.

Following an August 23, 1999 hearing at which the circuit court orally granted the State's Motion in Limine No. 2, the circuit court issued on September 10, 1999 the following findings of fact and conclusions of law, which were prepared by the deputy prosecuting attorney and approved as to form by Moses' attorney:

### FINDINGS OF FACT, CONCLUSIONS OF LAW

1. On September 11, 1998, Honolulu Police Department personnel responded to investigate the shooting of an on-duty police officer, Earl Haskell, which had occurred in the Makapuu area earlier in the afternoon.

2. During the incident, Defendant was also shot and transported to Queen's Medical Center for treatment.

3. Upon his arrival in the Queen's Emergency Room, he was examined and treated by Dr. Steven Nishida.

4. As part of Defendant's diagnosis and treatment, Dr. Nishida ordered a standard toxicology screening.

5. This toxicology screening performed by Diagnostic Laboratory Services, Inc. revealed the presence of cocaine metabolites in Defendant's blood and urine.

6. The Court considered the testimony of Susan Yamada (Supervisor of Chemistry and Custodian of Records for Diagnostic Laboratory Services, Inc.), Susan Orr (Nurse Manager, Queen's Medical Center) and William Haning, M.D. (Addiction Psychiatrist).

7. The Court further considered Exhibit A (Transcript of Taped Interview with Officer Earl Haskell by Detective Anderson Hee on September 13, 1998) attached to State's Motion in Limine No. 4.

8. Based upon the totality of circumstances, this Court finds and concludes that the positive finding of cocaine in Defendant's system is more probative than prejudicial. *See,* Rules 401, 402 and 403, *Hawaii Rules of Evidence*[.]

9. Specifically, the Court finds that said evidence is relevant to Defendant's appearance, demeanor, conduct and state of mind before and during the shooting incident. *See,* Section 702–230, *Hawaii Revised Statutes*[.]

10. The Court further finds that the probative value of Defendant's cocaine use may have actually had on Defendant is a matter of weight and not admissibility.

11. The Court accepts the prosecutor's representation that said evidence is not offered on the issue of Defendant's character.

12. The Court further finds and concludes that Defendant's remaining arguments lack merit as they seek exclusion of said evidence based upon: (1) the claim that the police did not have a warrant to obtain blood or urine samples from Defendant; and (2) the claim of physician-patient privilege.

13. As to Defendant's first claim, the Court finds that the toxicology screens were ordered by Defendant's attending physician and not the result of state action. As such, no warrant was required.

14. As to Defendant's second claim, the Court finds that while Defendant may have a proprietary interest in the blood or urine samples which were analyzed, the obtaining of these samples did not constitute "confidential communications" which implicate the physician-patient privilege. *See,* Rule 504, *Hawaii Rules of Evidence*[.]

■ The question before this court is whether the results of the toxicology screening of blood and urine samples from Moses

constitute a confidential communication under the physician-patient privilege set forth in Hawaii Rules of Evidence (HRE) Rule 504. The pertinent provisions of Rule 504 are as follows:

**Rule 504    Physician-patient privilege.**

(a) Definitions.   As used in this rule:

(1) A "patient" is a person who consults or is examined or interviewed by a physician.

(2) A "physician" is a person authorized, or reasonably believed by the patient to be authorized, to practice medicine in any state or nation.

(3) A communication is "confidential" if not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician, including members of the patient's family.

(b) General rule of privilege.   A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the patient's physical, mental, or emotional condition, including alcohol or drug addiction, among oneself, the patient's physician, and persons who are participating in the diagnosis or treatment under the direction of the physician, including members of the patient's family.

The Commentary to HRE 504 states:

The rule makes clear that privileged communications may relate to the diagnosis or treatment of "physical, mental, or emotional condition[s], including alcohol or drug addiction." Designed to encourage free disclosure between physician and patient, the privilege belongs only to the patient and may be invoked by the physician "only on behalf of the patient."

What is uncontested is that Moses' physician ordered toxicology screening as part of Moses' diagnosis and treatment. What is contested is a matter of law: whether toxicology screening of a patient's blood and urine samples for the purpose of diagnosis and treatment is a confidential communication under HRE Rule 504.

The Hawai'i Supreme Court has indicated that results of a physical examination and diagnostic tests of a patient are confidential communications. In *Dubin v. Wakuzawa*, 89 Hawai'i 188, 970 P.2d 496 (1998), the court indicated that "[d]iagnostic studies, including an EKG (electrocardiogram), pulse oximeter (*i.e.*, determination of blood oxygen level), and cervical spinal x-rays, as well as a physical examination" of a patient complaining of neck pain were confidential communications under HRE Rule 504 when the court ruled the results of the tests and physical exam came within exceptions to the privilege in that particular case (exceptions that are not applicable in this case). *Dubin*, 89 Hawai'i at 190 & 196, 970 P.2d at 498 & 504. The Hawai'i Supreme Court would not have considered exceptions to the physician-patient privilege unless the results of the diagnostic tests were considered confidential communications under HRE Rule 504.

Although not definitive, the Hawai'i legislature indicated the results of blood tests for medical reasons may be covered by HRE Rule 504 when it enacted HRS § 286–163 (authorizes police to obtain a blood or breath sample "as evidence of intoxication from the driver of a vehicle involved in an accident resulting in injury to or death of any person"). In enacting HRS § 286–163, the House Committee on Transportation stated:

[I]t is apparent that numerous intoxicated drivers are escaping the blood alcohol test by slipping through a loophole in the present statutory laws. Emergency room physicians see this happening more frequently. Currently, *blood alcohol testing* for medical reasons is allowed, but these *results are not suitable for consideration by the prosecution in a DUI case because of evidentiary problems.*

Hse. Stand. Comm. Rep. No. 392, in 1995 House Journal, at 1172 (emphasis added); *see State v. Entrekin*, 98 Hawai'i 221, 47 P.3d 336 (2002), on statutory history and purpose of HRS § 286–163.

The crux of the State's position is that HRE Rule 504 is not applicable in this case because the toxicology screens, and the blood and urine samples on which they were conducted, were not "communications." In its answering brief, the State argues:

> In the instant case, Defendant did not communicate the level of cocaine in his system to his doctor; it was measured pursuant to a regularly ordered test. Accordingly, the lower court rejected Defendant's claim of privilege on the ground that the medical records were not "confidential communications" protected by *H.R.E. Rule 504.*

The weight of authority, including the Hawai'i Supreme Court's treatment of HRE Rule 504 in *Dubin v. Wakuzawa, supra*, is contrary to the State's position.

*Wigmore on Evidence* does not share the State's narrow construction of the term "communication" under the physician-patient privilege. *Wigmore on Evidence* states:

> § 2384. **Information, active and passive.** Communications are the subject of the protection. But communication may be made by exhibition or by submission to inspection, as well as by oral or written narration or utterance. The invitation to the physician to prescribe assumes that he will first obtain the data for the prescription; and since the usual method of obtaining these involves the physician's own observation as well as the patient's narration, the invitation to prescribe is an implied communication of all the data which the physician may by any method seek to obtain as necessary for the prescription.
>
> It is therefore well settled that the data furnished *passively, through submission to inspection,* are equally within the privilege, whether the patient was himself aware or not of the existence of the specific data discovered[.]

8 John Henry Wigmore, *Wigmore on Evidence* § 2384 at 844–45 (McNaughton rev. 1961) (emphasis in original).

*The New Wigmore: Evidentiary Privileges* states that most jurisdictions define "communication" for purposes of the physician-patient privilege to include information

obtained by an examination of the patient. Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges* § 6.7.3 at 658 (2002).

> These definitions include both verbal information the patient actively conveys to the physician (communications in the normal sense) and nonverbal information that the physician gains by virtue of the patient's passive submission to the examination. The privilege can extend to the results of laboratory analyses of samples obtained from the patient during an examination.

*Id.* at 658–59 (footnotes omitted).

*Weinstein's Federal Evidence* states the "doctor-patient privilege covers verbal and nonverbal communications from the patient to the physician." 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 514.12[5][a] at 514–14 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.1997) (footnote omitted).

> The privilege generally covers not only communications between the patient and doctor, but also information of a medical nature observed by the doctor in the course of diagnosis or treatment.
>
> . . . .
>
> The privilege generally is held to apply to medical records that contain information about which the doctor could not be compelled to testify.

*Id.,* § 514.12[5][b] & [c] at 514–14 & 514–15 (footnotes omitted).

*McCormick on Evidence* states:

> Statutes conferring a physician-patient privilege vary extensively, though probably a majority follow the pioneer New York and California statutes in extending the privilege to "any information acquired in attending the patient." Understandably, these provisions have been held to protect not only information explicitly conveyed to the physician by the patient, but also data acquired by examination and testing. Other statutes appear facially to be more restrictive and to limit the privilege to *communications by the patient.* This appearance, however, may frequently be misleading, for *statutes of this sort*

*have been construed to provide a privilege fully as broad as that available elsewhere.*

1 Charles McCormick, *McCormick on Evidence* § 100 at 405 (5th ed.1999) (emphasis added; footnotes deleted).

Among the cases these major treatises on evidence cite to support their conclusions on the scope of the physician-patient privilege are: *State v. Henneberry,* 558 N.W.2d 708, 709 (Iowa 1997) (communications include "all knowledge and information gained by the physician in the observation and personal examination of the patient in the discharge of his duties"); *State v. Schroeder,* 524 N.W.2d 837, 842 (N.D.1994) (although at one point in its opinion the court states that "[w]e follow the ordinary meaning of 'communications' " in this context, the court adds that the privilege extends to "information and observations made by a physician for purposes of diagnosis or treatment of the patient's medical condition"); *Binder v. Superior Court,* 196 Cal.App.3d 893, 242 Cal.Rptr. 231 (1987) (photograph of a patient's skin lesion is a communication); *People v. Saaratu,* 143 Misc.2d 1075, 541 N.Y.S.2d 889 (1989) (the testimony of two physicians who discovered balloons containing heroin in a grand jury target's stomach during surgery and the balloons were subject to privilege); *State v. Comeaux,* 818 S.W.2d 46 (Tex.Crim.App. 1991) (covering nonverbal information gained by virtue of the patient's passive submission to an examination); *State v. Gabriel,* 72 Ohio App.3d 825, 596 N.E.2d 538 (1991) (extends to the results of laboratory analyses of samples obtained from the patient during examination); *People v. Maltbia,* 273 Ill.App.3d 622, 210 Ill.Dec. 497, 653 N.E.2d 402 (1995) (applied to emergency room personnel's discovery of illegal drugs found in motorist's underwear); *State v. Pitchford,* 10 Kan. App.2d 293, 697 P.2d 896 (1985) (blood tests done on drunk driving suspect were privileged because information would be helpful to suspect's treatment); *Sarphie v. Rowe,* 618 So.2d 905, 908 (La.App.1993) ("when an individual walks into a doctor's office and opens his mouth, ... everything spilling out of it, whether it be his identity or his false teeth ... is presumptively privileged.").

Moses cites two cases in support of his position that the toxicology screens were confidential communications: *State v. Santeyan,* 136 Ariz. 108, 664 P.2d 652 (1983), and *State v. Elwell,* 132 N.H. 599, 567 A.2d 1002 (1989).

The physician-patient privilege in *Santeyan* applied "to any information acquired in attending the patient which was necessary to enable [the physician] to prescribe or act for the patient." 136 Ariz. at 110, 664 P.2d at 654 (quoting A.R.S. § 13–4062(4)). The Arizona Supreme Court held this privilege protected "from disclosure hospital records containing information obtained from examination or testing of a patient." *Santeyan,* 136 Ariz. at 110, 664 P.2d at 654. Therefore, "[t]he results of the two urinalysis performed during the treatment of the defendant were privileged and, absent his consent, were not admissible in the trial." *Id.* The State correctly notes that the language of the privilege in *Santeyan* is different (the State says broader) than Hawai'i's privilege—"any information acquired in attending the patient" (Arizona) vs. "communication" (Hawai'i). Despite this difference in the language of the two privileges, the purposes are the same. The Arizona privilege "has as its primary function the protection of *communications* made by the patient to his physician for the purpose of treatment." *Id.* (emphasis added).

The Arizona Supreme Court in *Santeyan* cited other jurisdictions that have ruled that medical tests performed for the purpose of diagnoses or treatment are privileged: *Ragsdale v. State,* 245 Ark. 296, 432 S.W.2d 11 (1968); *Alder v. State,* 239 Ind. 68, 154 N.E.2d 716 (1958); *State v. Rochelle,* 11 Wash.App. 887, 527 P.2d 87 (1974); and *Branch v. Wilkinson,* 198 Neb. 649, 256 N.W.2d 307 (1977).

In *Ragsdale,* the Arkansas Supreme Court held that the results of a blood-alcohol test administered to a criminal defendant for the purpose of prescribing and treating his injuries were privileged. The relevant Arkansas statute provided "that no doctor or nurse shall be compelled to disclose any information which is acquired from his patient to

enable him to prescribe." 245 Ark. at 298, 432 S.W.2d at 12.[12]

In *Alder,* the physician-patient privilege at issue read as follows:

"The following persons shall not be competent witnesses:

\* \* \*

"Fourth. Physicians, as to matter *communicated* to them, as such, by patients, in the course of their professional business, or advice given in such cases."

239 Ind. at 74, 154 N.E.2d at 719 (emphasis added) (quoting Ind.Code Ann. § 2–1714 (Burns 1946)).

*Alder* was an involuntary manslaughter case where the defendant was lying unconscious in the hospital following an accident when the physician on call took a blood sample from the defendant to determine his blood type for a blood transfusion. A state police officer requested and was given a sample of defendant's blood for the purpose of making an alcohol test. The Indiana Supreme Court ruled:

That the blood sample here in question was taken from appellant by the physician "in the course of his professional business" is not disputed. Neither is it denied that part of the blood sample was, on instructions of the physician, given by the nurse to the State Police officer, without the consent of appellant.

*"Matter communicated"* as used in the statute has been defined *"as information obtained in the sick room,* heard or observed by the physician, or of which he is otherwise informed pertaining to the patient and upon which he is persuaded to do some act or give some direction or advice in the discharge of his professional obligation."

In the case at bar the patient was unconscious and was completely in the trust and care of the physician. If, under such circumstances, a physician is prohibited by statute from testifying as to the intoxicated

condition of the patient, it is our opinion that the statute would also *prohibit testimony of a physician concerning a sample of blood which he took from the patient* and caused to be delivered to the State Police officer to be used in determining the alcoholic content of the blood. This was clearly *information obtained by the physician "in the sick room"* and it was error to overrule appellant's objection to testimony concerning the same.

239 Ind. at 76, 154 N.E.2d at 720 (internal quotation marks and footnote omitted; emphasis added).

In *Rochelle,* a negligent homicide case, the Washington Court of Appeals ruled that the urinalysis performed pursuant to a physician's direction was a privileged communication. 11 Wash.App. at 892, 527 P.2d at 90. The language of the privilege in Washington was similar to that in Arizona: "any information acquired in attending such patient." Wash. Rev.Code § 5.60.060(4).

The final case cited in *Santeyan* is *Branch v. Wilkinson.* The pertinent provisions of Nebraska's physician-patient privilege are:

§ 27–504. Rule 504. Physician-patient privilege; professional counselor-client privilege; definitions; general rule of privilege; who may claim privilege; exceptions to the privilege.

(1) As used in this rule:

(a) A patient is a person who consults or is examined or interviewed by a physician for purposes of diagnosis or treatment of his or her physical, mental, or emotional condition;

(b) A physician is (i) a person authorized to practice medicine in any state or nation or who is reasonably believed by the patient so to be . . .;

. . . .

(e) A communication is confidential if not intended to be disclosed to third persons other. than those present to further the interest of (i) the patient in the consultation, examination, or interview, persons

12. The Arkansas physician-patient privilege was subsequently revised by the legislature to cover "confidential communications." The Arkansas Supreme Court held the revised privilege "is aimed at preventing a doctor from repeating what a patient told him in confidence." *Baker v. State,* 276 Ark. 193, 195, 637 S.W.2d 522, 525 (1982).

reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician, including members of the patient's family[.]

(2)(a) A patient has a privilege to refuse to disclose and to prevent any other person from disclosing *confidential communications* made for the purposes of diagnosis or treatment of his or her physical, mental, or emotional condition among himself or herself, his or her physician, or persons who are participating in the diagnosis or treatment under the direction of the physician, including members of the patient's family.

Nebraska Rules of Evidence Rule 504 (Neb. Rev.Stat. § 27–504 (1994)) (emphasis added).

The Nebraska Supreme Court ruled in *Branch* that the taking of blood samples from a patient comes within the term "communications" of the physician-patient privilege:

The next factor to be determined is whether the extraction of a blood sample comes within the contemplation of the privilege. The physician-patient privilege protects not only statements made by the patient to the physician, but also facts obtained by the physician by observation or examination.... [W]hen one submits to an examination, the knowledge so acquired by the physician is privileged.

The taking of a blood sample from a patient clearly comes within the contemplation of the physician-patient privilege. The plaintiff cites the Supreme Court case of *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), which recognizes the distinction drawn between oral communications and physical evidence, e.g., a blood sample, for purposes of the Fifth Amendment. The plaintiff points out that section 27–504, R.R.S. [Neb.Rev.Stat.] 1943, speaks of "communications" between the physician and patient and argues, based upon the above, that the blood sample is not a "communication." The above distinction is relevant only to Fifth Amendment analysis and has no application to the physician-patient privilege. *Extraction and analysis of a blood sample is clearly within the contemplation of the privilege.*

198 Neb. at 656–57, 256 N.W.2d at 313 (citations omitted; emphasis added).

*Santeyan* and the cases it cites (*Ragsdale, Alder, Rochelle,* and *Branch* ) are contrary to the State's position that the physician-patient privilege does not apply to test results from patient blood and urine samples ordered by a physician for the diagnosis and treatment of the patient. The State cannot dismiss *Santeyan* solely because the language of the privilege in *Santeyan* ("any information acquired") differs from Hawai'i's language ("communications"). *Santeyan* stated that the primary function of Arizona's privilege was "the protection of communications made by the patient to his physician for the purpose of treatment." Even if *Santeyan* can be distinguished, the cases it cites and on which it relies cannot. The Arkansas privilege of *Alder* used the term "communicated" and *Branch* used the term "communications."

In the second case cited by Moses, *State v. Elwell,* the physician-patient privilege of the New Hampshire statute (N.H.Rev.Stat. Ann. § 329:26 (Supp.1988)) is stated in pertinent part:

The *confidential relations and communications* between a physician or surgeon licensed under provisions of this chapter and his patient are placed on the same basis as those provided by law between attorney and client, and, except as otherwise provided by law, no such physician or surgeon shall be required to disclose such privileged communications. *Confidential relations and communications* between a patient and any person working under the supervision of a physician or surgeon that are customary and necessary for diagnosis and treatment are privileged to the same extent as though those *relations or communications* were with such supervising physician or surgeon.

132 N.H. at 604, 567 A.2d at 1005 (emphasis in original; internal quotation marks omitted).

In *Elwell,* a negligent homicide case, the New Hampshire Supreme Court ruled that blood samples taken from the patient-defen-

dant at the direction of the attending physician and information acquired from the analysis of the blood sample were subject to the physician-patient privilege. The New Hampshire Supreme Court wrote:

> We conclude that the *blood test results produced at the direction of the hospital physician are subject to the physician-patient privilege.* In addition, the physical blood sample, which was taken by hospital staff at the direction of the attending physician, is protected from disclosure because it was the result of a routine procedure essential in obtaining information necessary for diagnosis and treatment.

132 N.H. at 605, 567 A.2d at 1006 (emphasis added).

The State attempts to distinguish *Elwell* by arguing that under *Elwell* the physician-patient privilege is not absolute and may yield where the police do not have opportunity to obtain essential evidence. This argument does not distinguish *Elwell.* The issue in this case is the scope of the privilege, in particular the term "communications." *Elwell* held that "communications" applied to the very type of test taken in this case. This the State ignores. Whether the physician-patient privilege under HRE Rule 504 is absolute or under certain circumstances yields to law enforcement needs is not at issue in this case and is certainly no basis for distinguishing *Elwell.*[13]

The State gives no other argument in response to *Elwell* or *Santeyan.* Moreover, it has cited no cases other than *Sapp v. Wong,* 62 Haw. 34, 609 P.2d 137 (1980), for the State's proposition that "because privileges exclude relevant evidence, they must be strictly construed," and *In re Doe,* 8 Haw. App. 161, 795 P.2d 294 (1990), for the State's position that "the burden lies upon the per-

son claiming a privilege to establish that it applies."

■ We conclude that the circuit court erred when it ruled the toxicology screens ordered by Moses' attending physician were not confidential communications covered by the physician-patient privilege. Our conclusion follows *Dubin v. Wakuzawa, supra,* and is dictated by the stated purpose of the privilege: "to encourage free disclosure between physician and patient." Commentary to HRE 504. As *Dubin* demonstrates, information obtained by a physician from a patient through a physical examination and diagnostic tests can be far more valuable in diagnosing and treating a patient than information obtained from statements the patient makes to the physician. A privilege that would exclude the results of physical examinations and diagnostic tests is almost no privilege at all. It is not for us to vitiate the physician-patient privilege, but to apply the privilege consistent with its stated purpose as it is applied throughout most of the United States.[14]

## III.

### WHETHER PRIVILEGE WAIVED

Although not raised in the circuit court or in its answering brief, the State contended at oral argument that assuming arguendo the physician-patient privilege applied in this case, the privilege was waived by Moses. To support this contention, the State directed this court's attention to the March 23, 1999 hearing before the Honorable John S.W. Lim on Moses' "Motion to Compel Discovery, or in the Alternative, Motion to Dismiss Indictment" and "Motion for Bill of Particulars, or in the Alternative, Motion to Dismiss Indictment." Informing the court on the exchange

---

13. *Elwell* held that the physician-patient privilege will yield when the disclosure of information is essential to obtain a criminal conviction. 132 N.H. at 605–06, 567 A.2d at 1006–07. There is no showing by the State that Moses' toxicology screens were essential for conviction of the charges in this case.

14. Currently forty-two of the fifty states have statutes codifying the privilege. Imwinkelried,

*supra,* § 6.2.6 at 490. *See* 8 Wigmore, *supra,* § 2380 at 820–27 & Supp.2002 at 1307–23, for a list and text of statutes. Some jurisdictions exempt criminal proceedings from the scope of the privilege. Imwinkelried, *supra,* § 6.2.6 at 496. Hawai'i's privilege has been determined to apply to criminal proceedings. *State v. Swier,* 66 Haw. 448, 666 P.2d 169 (1983).

of discovery materials, Moses's counsel stated at that hearing:

> [Deputy Public Defender:] The medical records of Earl Haskell, beginning with his injury on September 11th. I've just been given a packet of discovery by the State which I assume to be that on this date, and I've signed for it and I appreciate that from [the deputy prosecuting attorney]. We have provided [the deputy prosecuting attorney] previously with the defendant's medical records so that those didn't have to be subpoenaed and compelled.

The record before this court is inadequate to determine what was in "defendant's medical records" that Moses' counsel said she provided to the State. We decline the request of the State to consider its argument that Moses waived his physician-patient privilege.[15] This issue was not raised and addressed in the circuit court. The record before us is inadequate to address this issue for the first time on appeal. Whether or not Moses waived the physician-patient privilege involves questions of fact to be addressed by the circuit court. *See In re a Female Child by Doe*, 85 Hawai'i 165, 170, 938 P.2d 1184, 1189 (App.1997) (addressing evidence of waiver under HRE Rule 511).

## IV.

### WHETHER HARMLESS ERROR

█ Because we conclude the results of the toxicology screening of blood and urine samples from Moses were confidential communications under the physician-patient privilege, we must now address the question of whether the erroneous admission of this evidence was harmless.

> [E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in [the] light of the entire proceedings and given the effect [ ] which the whole record shows it [to be] entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*State v. Heard*, 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Gano*, 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999) (internal quotation marks omitted).

At trial, Dr. Nishida testified that Moses' blood screen tested positive for cocaine metabolites and Moses' urine screen tested positive for cocaine. Dr. Haning testified cocaine is capable of suppressing appetite and sleep, enhancing momentary attention and ability to focus/concentrate, and acting as an aphrodisiagenic and euphorigenic, and that as use and frequency increase, it can cause paranoia, fearfulness, irritability, agitation, and an increasing willingness to be aggressive and defensive. He added that the effects may include hallucinations and delusions. According to Dr. Haning, Moses' blood test showed the presence of cocaine metabolite benzolecgonine and Moses' urine test indicated the minimum concentration of cocaine necessary to produce a positive result. Dr. Haning testified that Moses' test results indicated the presence of cocaine metabolites, Moses would have had to ingest cocaine to get those test results, and there was an 80% probability that Moses had ingested the cocaine within twenty-four hours before the blood tests.

---

15. The relevant Hawaii Rules of Evidence are:

**Rule 511 Waiver of privilege by voluntary disclosure.** A person upon whom these rules confer a privilege against disclosure waives the privilege if, while holder of the privilege, the person or the person's predecessor voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is a privileged communication.

**Rule 512 Privileged matter disclosed under compulsion or without opportunity to claim privilege.** Evidence of a statement or other disclosure of privileged matter is not admissible against the holder of the privilege if the disclosure was (1) compelled erroneously, or (2) made without opportunity to claim the privilege.

Following Dr. Haning's testimony, the circuit court gave the following instruction to the jury:

The prosecution has introduced evidence that defendant Peter Moses tested positive for cocaine metabolites shortly after he was admitted to Queen's Medical Center on September 11, 1998.

Defendant's possible intoxication from cocaine use may not be considered by the jury as a defense to any of the offenses charged and may not be used to disprove that defendant acted with the required mental state for any offense. However, evidence of intoxication at the time of the conduct charged may be considered by the jury in deciding if defendant acted in any relevant manner or had any relevant state of mind to prove any of the offenses charged.

At the conclusion of evidence, the circuit court also gave the following jury instruction:

Evidence of self induced intoxication of the defendant may not be used to negative the state of mind sufficient to establish an element of the offense. However, evidence of self induced intoxication of the defendant may be used to prove or negative conduct, or to prove state of mind sufficient to establish an element of an offense.

Quote, intoxication, end quote, means a disturbance of mental or physical capacities resulting from the introduction of substances, including alcohol, into the body.

Quote, self induced intoxication, end quote, means intoxication caused by substances, including alcohol, which the defendant knowingly introduces into his or her body, the tendency of which to cause intoxication he or she knows or ought to know.

In closing, the State argued:

[Deputy Prosecuting Attorney:] Defendant's story. What do we know? Let's look at a few things. We know he's an admitted liar. He lies when it's convenient. You consider that. We would submit that he was not completely credible. And he certainly was not, we would submit, truthful to you when he told you the version of the events that he wants you to believe.

Basically, he says he was thinking clearly. But he's got cocaine in his system.

[Deputy Public Defender]: Objection.

THE COURT: I'll permit. Overruled. There's an instruction to the jury.

[Deputy Prosecuting Attorney]: He's got cocaine in his system. Nobody is saying that he was so high and bonzo on drugs that he didn't know what he was doing. We know he had drugs in his system. That's a fact. But then he took the witness stand and when asked directly by me, "So you're on cocaine," he denies being on cocaine.

What is that, some loophole there, sort of to say well, you know, I was thinking clearly, therefore my recollection of the events is better than the three police officers? Who, we would submit, were not impaired in any way, shape or form as far as the cocaine, as the defendant was.

The erroneous admission of evidence went to Moses' state of mind and conduct as well as to his credibility. The circuit court instructed the jury on two occasions that evidence of Moses' testing positive for cocaine could be considered in deciding Moses' state of mind and conduct, which, based on Dr. Haning's testimony, could include paranoia, fearfulness, irritability, agitation, increasing willingness to be aggressive and defend oneself against perceived threats, and hallucinations and delusions. The State argued in closing that Moses had cocaine in his system and therefore would not have been thinking as clearly as the three police officers who were not impaired by cocaine. Furthermore, argued the State, Moses was an admitted liar and could not be believed because he denied being on cocaine.

Moses' convictions resulted from the jury believing the testimony of the three police officers as opposed to Moses' testimony. There was a reasonable possibility that the evidence that Moses had tested positive for cocaine may have weighed against Moses and, therefore, contributed to his conviction of all charges except Count VIII, Unauthorized Entry into Motor Vehicle, which Moses conceded. *Gano*, 92 Hawai'i at 177, 988 P.2d at 1169. Accordingly, we cannot say the admission of the toxicology screening was

harmless beyond a reasonable doubt, with the exception of Count VIII.

## V.

## CONCLUSION

Accordingly, we vacate the December 8, 1999 Judgment of the circuit court, with the exception of Moses' conviction and sentence pursuant to Count VIII (Unauthorized Entry into Motor Vehicle) which we affirm, and remand this case to the circuit court for a new trial on the remaining counts.